794 So.2d 1249 (2001)
John HESS, Appellant/Cross-Appellee,
v.
STATE of Florida, Appellee/Cross-Appellant.
No. SC90026.
Supreme Court of Florida.
May 17, 2001.
Rehearing Denied August 30, 2001.
*1252 James Marion Moorman, Public Defender, and A. Anne Owens, Assistant Public Defender, Tenth Judicial Circuit, Bartow, FL, for Appellant/Cross-Appellee.
Robert A. Butterworth, Attorney General, and Robert J. Landry, Assistant Attorney General, Tampa, FL, for Appellee/Cross-Appellant.
PER CURIAM.
We have on appeal the judgment and sentence of the trial court imposing the death sentence upon John Hess. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. We affirm Hess's conviction for first-degree murder, but vacate his sentence of death.

I. FACTS
Appellant was convicted of the murder of John Galloway. Although an initial suspect, appellant was not arrested for the crime until over two years after the murder. The circumstances of the crime and the appellant's involvement as reflected in the evidence presented at trial may be characterized as unusual, if not bizarre. The victim was a security guard at Lake Fairways, a residential community in Fort Myers. On the evening of May 11, 1993, Mr. Galloway was on duty at the post that guarded the entrance to the community. Another guard found Mr. Galloway's dead body just outside the guard post at 1:15 a.m. Mr. Galloway had been killed by a gunshot.
The State presented evidence to establish that the shooting occurred near midnight. The medical examiner testified that the cause of death was a gunshot wound to the chest and that death would have followed almost immediately. The path of the bullet was back-to-front and left-to-right, with very little vertical movement. In addition to the projectile located in Mr. Galloway's chest, a second copper-colored projectile was located close to the body and a ricochet mark was located on the wall of the guardhouse. The gun used in the murder was never discovered. Mr. Galloway's left front pants pocket was pulled out.
The victim's widow testified that a camel-colored, tri-fold wallet which Mr. Galloway regularly carried was missing. In the wallet were several credit cards including a Shell gasoline credit card, an automated teller machine (ATM) card, and a MasterCard. The Shell credit card was used a short time after the homicide at a Shell station in Fort Myers where appellant's wife worked. An unsuccessful attempt was made to use the ATM card at a bank in south Fort Myers shortly after 1 a.m. and the MasterCard was used to rent a motel room at approximately 4 a.m. in Everglades City.
On May 10, 1993, two days before the homicide, appellant began working at Omar Security. Michael Warren, a manager at Omar Security, testified that on that date appellant told him about a security guard who was shot while on duty the previous evening at a bus garage for the *1253 Lee County school system in Fort Myers. Geraldine Lindsay, a security guard who overheard the conversation from another room, testified that her recollection was that appellant said the guard was shot at a security booth in Lee County rather than at the bus garage. Warren also testified that Hess told him many stories which Warren paid little attention to.
On May 12, 1993, when Michael Warren read about Mr. Galloway's death, he contacted the Lee County Sheriffs Department and spoke with Gil Allen, the deputy in charge of the Galloway homicide investigation. Deputy Allen arranged for Mr. Warren and an undercover agent from the sheriffs office, equipped with an electronic recording device, to get appellant to repeat the statements he had made to Mr. Warren. The appellant repeated the statements to Warren at a Target store where appellant was performing security services and a recording of this conversation was admitted into evidence at trial.
Appellant also gave numerous conflicting and confusing statements to the police about the shooting. The first occurred on May 14, 1993, with Deputy Allen at the Lee County Sheriff's Department where appellant stated that he was home with his wife on the night of the murder and had heard two gunshots that night from his home. Deputy Allen knew this was not possible since appellant lived approximately eight miles from Lake Fairways. Appellant also stated that he monitored the guards' routine at Lake Fairways and he described in detail the entrance guard post and surrounding area. He also stated that Mr. Galloway was not armed while on duty. During the course of the interview, Deputy Allen asked appellant to hypothesize his opinion as to what might possibly have happened. Appellant opined: (1) that the guard would have come outside of his shack to address the intruder; (2) that two shots were fired; (3) that the guard was shot in the chest, dying instantly; and (4) that the guard fell straight on his back.[1]
Appellant also told Allen that he learned of Mr. Galloway's death on a citizens band (CB) radio. However, when Allen confronted appellant about his prior statements to Mr. Warren, appellant changed his story and said that another security guard had told him about the killing. When Deputy Allen challenged this statement, appellant said that he believed Lloyd Sawyer, a security guard who worked with him at his previous employment, killed Mr. Galloway in a competitive effort to scare away the current security service. On May 15, 1993, appellant contacted Allen and recounted the statement he had made about the CB and Mr. Sawyer. He also told Allen that he had made up the story he originally told Warren.
Some time later appellant again contacted the police and told them of dreams he had of the murder. In these dreams, appellant saw someone pull a gun on the victim and demand money. The guard then gave the robber his wallet and when the guard made a move toward a phone the killer shot at him. When the two began to struggle, another shot was fired that hit the guard in the chest. According to appellant, after the murder the killer ran to his car, where he met with his partner, a male. The two left in a car together. Appellant indicated that the guard's wallet was a tri-fold wallet. Inside the wallet they found an ATM card. The killer cut the ATM card into several pieces *1254 after several unsuccessful attempts to use the card. The killer dropped his partner off at an undisclosed location and gave him the wallet with the remaining credit cards. Appellant agreed to conduct a walk-through of the crime as seen in his dreams and an audiotape of the walk-through was admitted in evidence at trial.
Despite his suspicious and conflicting statements, appellant was not arrested or charged with the killing. Indeed, at trial, Deputy Allen testified that at that point in time he felt there was insufficient evidence linking appellant to the Galloway murder beyond appellant's statements. In fact, there was evidence that someone else driving a car unconnected to Hess may have been the killer. Deputy Allen testified that on June 17, 1993, he spoke with the night clerk of the Everglades City hotel where Mr. Galloway's credit card was used. Based on a description provided by the clerk, police distributed fliers looking for a white male in his late thirties or forties, approximately six feet tall, 190 pounds, with brown, slightly graying hair. The fliers noted that the suspect was driving a classic red Mustang. Deputy Allen stated that he followed up on this lead, but that it did not result in anything substantial. There were no witnesses to the shooting and none of the physical evidence obtained during the ensuing criminal investigation linked appellant to the crime. Further testing performed on handwriting samples taken from both appellant and his wife, as well as the gas station receipt and the motel receipt yielded inconclusive results. In addition, no wallet, credit cards, or weapon were ever located.
However, approximately two years after the Galloway death, appellant was arrested in Michigan on unrelated charges involving misconduct allegedly occurring in Florida and he agreed to return to Florida.[2] Upon returning to Lee County, Deputy Crone, who had since replaced Deputy Allen in the investigation, again interviewed appellant about the Galloway homicide after first advising him of his Miranda[3] rights. In this interview appellant gave yet another confusing story that he and a person named Sawyer traveled to Lake Fairways to harass the security guard on duty in order to get the security contract for Lake Fairways. However, appellant stated that he stayed in the back seat of the car while Sawyer approached Galloway, shot him twice, and took his wallet. In a subsequent interview, appellant told a somewhat similar story with other details about witnessing the shooting.
On April 10, while at the Criminal Investigation Division of the Sheriffs Office, appellant asked to speak to Deputy Crone again for the purpose of "telling him the truth" about the Galloway murder.[4] *1255 Shortly thereafter, Deputy Crone took a recorded statement from appellant after first advising him of his Miranda rights. Appellant indicated that he understood his rights and wanted to talk to Deputy Crone without a lawyer. In this statement, appellant admitted to shooting Mr. Galloway but described a shooting which was accidental, and claimed that Sawyer was not involved. Appellant told Deputy Crone that he had previously implicated Sawyer because he held a grudge against him. Appellant again agreed to do a walk-through of what happened. This walk-through was videotaped and shows that Deputy Crone began by reading appellant his Miranda rights. Appellant acknowledged his rights and then waived them. Appellant then stated that on the night of the murder he was wearing his security uniform from Omar Security and was on his way to relieve Mr. Galloway.[5] Appellant had a gun in his left front pants pocket. When appellant reached the guard post he told Mr. Galloway that he was there to relieve him. Mr. Galloway told appellant he was crazy and pushed him down. Galloway then attempted to physically oust appellant. Galloway grabbed appellant's front left pants pocket, and the gun discharged with one shot hitting Galloway in the chest. Appellant then searched Galloway's pockets and found a "three-way fold" wallet in his back pocket. He took the wallet and left, heading southbound on Highway 41.
On April 12, 1995, appellant again spoke with Deputy Crone. This time he stated that on the night of the crime he picked Ms. Hess up at work and the two went to dinner at a Denny's restaurant. Afterwards, they drove to Lake Fairways because appellant wanted to talk to the security guard there about changing jobs. When the guard called him an idiot an altercation ensued between the two. When appellant moved his hand into his pants pocket where he had a gun, the guard also reached for the pocket. At this time, the gun discharged while still in appellant's pocket, leaving a burn mark on his leg and a hole in his pants.[6] The guard grabbed his chest and fell backwards. Appellant then went through the guard's pocket and found a wallet. Appellant ran back to his car, where he told Ms. Hess what happened and gave her the wallet. They stopped at a bridge and threw the gun into the river, and continued traveling south on Highway 41 to a Shell service station where Ms. Hess worked. After that, they drove south on Highway 41 to Everglades City, where they rented a motel room using Mr. Galloway's credit card. Ms. Hess signed the register in Mr. Galloway's name. Appellant stated that he bought the gun he used from a clerk *1256 named Carl at a pawn shop across the street from where he lived.
Juli Hess, who was married to appellant at the time of the homicide, testified at the trial that she was with appellant the night of the shooting and her testimony generally supported appellant's April 12 statement to Crone about how the killing took place.[7] However, she stated that she did not actually witness the shooting and she did not testify as to any advance plans for a robbery or shooting. According to her testimony at trial, she remained in the car while appellant was at the guard shack, and listened to music with the windows up. At the time of trial she had been living with another man for a year and a half and she had asked her husband, Hess, for a divorce. She testified that she was threatened with arrest by Crone if she did not testify against Hess, and also admitted that she had given numerous previous statements denying any knowledge of the crime.
At trial, appellant testified that he was innocent and his only concern was protecting his wife. He said that after coming to Florida in 1991, he worked for several security companies and his goal was to become a police officer. He stated that on the night of the homicide he was working as a security guard. After his security shift ended, he picked up his wife at the Shell station at around 12:15 a.m. and they went to Denny's, where they had dinner and remained for about an hour and a half. After leaving Denny's, they drove back to the Shell station for coffee, and then went home. Appellant stated that he first learned of the murder the following day on the midday news. Appellant testified that he did not remember making any statement prior to the murder about a security guard being shot. Appellant also stated that he was a good talker and he invented the earlier statements he made because he was seeking employment with the sheriffs department, and he thought that if he were helpful in solving the Galloway homicide then Deputy Allen would write him a letter of recommendation. He stated that his statements beginning with those on April 10, 1995, were coerced. He also stated that the police had deprived him of the medication he was taking for depression and other mental problems. He said the police told him that people like him go to mental hospitals, not prison, and that if he did not cooperate his wife could go to prison.
The jury convicted appellant of first-degree murder and robbery with a firearm. At the penalty phase the State presented Betty Galloway and Linda Crosby. Galloway was the victim's spouse. Her *1257 testimony was brief and focused on victim impact. Crosby was a sheriff's deputy for the Lee County Sheriff's Office. During her testimony, the State introduced a certified copy of appellant's prior convictions on two counts of sexual activity with a child and lewd assault on a child.
Defense counsel presented appellant's sister, Julie Ann Teachworth, and appellant. Hess's sister testified in detail about appellant's mental problems, troubled childhood, his first marriage, and the impact on appellant of social services taking his two boys away from him.[8] She testified *1258 that Hess had serious and chronic mental problems since he was an infant and that he was borderline retarded as an adult. Appellant's testimony corroborated much of Teachworth's testimony. Appellant also stated that in 1993 he was taking 600 milligrams of Lithium and 100 milligrams of Klonopin for depression. He claimed that he would "not hurt a fly" and expressed sympathy for the victim's family. After closing arguments, the case was submitted to the jury. The jury, after deliberating for one hour, recommended by an eight-to-four vote that appellant be sentenced to death.
The trial court found two aggravating circumstances: (1) the murder was committed during the commission of a robbery; and (2) appellant had a prior violent felony conviction. The court considered the following mitigating factors: (1) appellant is a loving son to his parents (slight weight); (2) appellant is a loving brother to his siblings (very little weight); (3) appellant was employed throughout most of his adult life (minimal weight); (4) appellant is a loving and caring father (some weight); (5) appellant provided financial support to his family and to his siblings' families (slight weight); (6) appellant lacked a male role model when he was growing up (very little weight); (7) appellant was traumatized by having his two sons taken away from him (slight weight); (8) appellant became very ill at a young age, leaving him with a learning disability (minimal weight); (9) appellant was treated cruelly by his contemporaries (little weight); (10) appellant accepts blame for things he did not do to keep loved ones out of trouble; (11) appellant cooperated with law enforcement (little weight); (12) treatment of others in this case (minimal weight); (13) appellant suffered from some mental or emotional disturbance when this murder was committed (moderate weight); (14) appellant's religious devotion (slight weight); (15) length of appellant's potential sentence (some weight), and (16) appellant's good conduct while in jail and on trial (minimal weight). Upon a consideration of these factors and the jury's recommendation, the trial court imposed a sentence of death.

II. DISCUSSION
Appellant raises seven issues in this direct appeal.[9] The State, by way of cross-appeal, raises one issue.[10] We will first address each of appellant's seven issues, and then we will address the State's issue.

Guilt/Innocence Phase

Suppression of Appellant's Pretrial Statements
In his first issue, appellant claims that the trial court erred in denying his *1259 motion to suppress statements he made to police on April 10, 11, and 12, 1995, arguing that the police officers elicited those statements in violation of the Fifth and Fourteenth Amendments to the United States Constitution.[11] Appellant bases this argument on the assertion that the officers continued to question him without a lawyer present despite the fact that he signed a written notice of invocation of his Fifth Amendment right to counsel on April 4, 1995. After reviewing the record in this case, we conclude that appellant's executed written notice of constitutional rights dated April 4, 1995, was not an invocation of his Fifth Amendment right to counsel in respect to this case. Moreover, we find that there is evidence in the record of the hearing on the motion to suppress that appellant requested to talk with Deputy Crone subsequent to April 4, 1995, and that in each contact with Deputy Crone, on April 10, 11, and 12, appellant was advised of his Miranda rights and that appellant waived those rights.
The record reflects that appellant moved the trial court to suppress all of appellant's statements made after April 4, 1995, the date appellant signed a document purporting to invoke his Fifth Amendment right to counsel. The trial court held an evidentiary hearing on March 18, 1996. Testifying at the hearing were appellant and Deputies Stanforth, Griner, and Crone. Appellant's contention centers upon a document which is entitled "Notice of Defendant's Invocation of Constitutional Rights," which bears a date of April 4, 1995. This is a printed form of the Office of the Public Defender for the Twentieth Judicial Circuit, of which Lee County is a part. It states in pertinent part:
The undersigned Defendant having been advised that he/she has been arrested and charged with a crime, does hereby invoke the right to counsel and right to remain silent under the 5th, 6th and 14th Amendments to the United States Constitution and Article I, Sections 2, 9, and 16 of the State of Florida Constitution and the case law thereunder. I desire to have my attorney, the Public Defender, or one of his assistants, present before and during any questioning, interrogation, interviewing or other conversation whatsoever between myself and any police agency, prosecutor or agents thereof whether local, State or Federal. I hereby announce my desire to have counsel present before anybody talks to me about any matters relating to this case or any other criminal matter in which I am a suspect or can reasonably be expected to become a suspect based on anything I might say.
The document reflects a file stamp of the Felony Division, Clerk of Courts. The document contains a certification by an assistant public defender stating that a copy was furnished to John J. McDougall, Sheriff of Lee County, and Joseph P. D'Alessandro, State Attorney, on April 4, 1995. The exact circumstances under which this document was signed were not established in the record.[12]
*1260 In argument to the trial court, defense counsel stated that his motion was based entirely upon State v. Guthrie, 666 So.2d 562 (Fla. 2d DCA 1995).[13] The trial court denied the motion by order dated April 9, 1996. This Court subsequently disapproved Guthrie in Sapp v. State, 690 So.2d 581 (Fla.1997). In Sapp, this Court held that an accused may not effectively invoke the right to counsel under the Fifth Amendment to the United States Constitution or article I, section 9 of the Florida Constitution until a custodial interrogation has begun or is imminent. In reaching our decision, we relied on McNeil v. Wisconsin, 501 U.S. 171, 182 n. 3, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991), United States v. LaGrone, 43 F.3d 332 (7th Cir. 1994), Alston v. Redman, 34 F.3d 1237 (3d Cir.1994), and United States v. Wright, 962 F.2d 953 (9th Cir.1992). Subsequent to our decision in Sapp, the Eleventh Circuit reached a similar conclusion in United States v. Grimes 142 F.3d 1342 (11th Cir. 1998).
We conclude that the facts of the instant case are analogous to the factual scenario presented in Sapp. Sapp was arrested on a charge of robbery. After his arrest, Sapp signed an invocation-of-rights form provided by the public defender while the public defender was explaining first appearance court procedures to several inmates. The rights form was substantially similar to the one present in the instant case. A week later, while still in jail, Sapp was taken to a police station, where he was questioned about a homicide unrelated to the robbery for which he was in custody. Sapp was read his Miranda rights, waived his rights, and proceeded to make a statement. Later, Sapp gave a second statement. The trial court denied Sapp's motion to suppress the statements he made regarding the homicide. Sapp was ultimately convicted of armed robbery and felony murder.
This Court held that Sapp's signing of the form in respect to the robbery charge did not invoke his Fifth Amendment right to counsel in respect to the murder, stating:
[T]he reason for informing individuals of their rights before questioning is to ensure that statements made during custodial interrogation are given voluntarily, *1261 not to prevent individuals from ever making these statements without first consulting counsel.
Sapp, 690 So.2d at 586. The Court went on to state:
A rule allowing one to invoke the right to counsel for custodial interrogation before it is even imminent (whether it be through a claim of rights form or by any other means) would provide little additional protection against involuntary confessions but would unnecessarily hinder lawful efforts by police to obtain voluntary confessions.
Id. The circumstances of this case are also similar to those involved in Alston v. Redman, 34 F.3d 1237 (3d Cir.1994), cert. denied, 513 U.S. 1160, 115 S.Ct. 1122, 130 L.Ed.2d 1085 (1995), a case upon which this Court expressly relied in Sapp.
Consistent with the holding and reasoning of Sapp, we find that appellant's execution of the invocation form dated April 4, 1995, incident to his custody on other charges, was insufficient to trigger his Fifth Amendment right to counsel in respect to the Galloway homicide because the form did not relate to interrogation which was being conducted or which was imminent in regard to the Galloway homicide. Rather, as in Sapp, the record supports the conclusion that the form related to the charges for which appellant had been extradited, was in custody, and had made court appearances. Moreover, the record supports the conclusion that, after executing the form, appellant requested to speak with the deputy in respect to the Galloway homicide and, when given an opportunity to request counsel, agreed to speak to the deputy without counsel. As in Sapp, the form signed by appellant appears to be one that is routinely provided by newly appointed counsel. Hence, under our holding in Sapp, we find no basis in this record to overturn the trial court's ruling.

Sufficiency of Evidence
In his next several issues appellant challenges the sufficiency of the evidence to sustain his conviction for first-degree murder. He contends that the interests of justice mandate that he be discharged or that a new trial be ordered because of the questionable nature of the evidence used to convict him. See Tibbs v. State, 397 So.2d 1120 (Fla.1981). We disagree. The jury found appellant guilty of both first-degree premeditated murder and first-degree felony murder. Because we find sufficient evidence of felony murder, we need not address appellant's claim that the trial court erred in denying his motion for judgment of acquittal because the evidence was insufficient to establish premeditation. See Brown v. State, 644 So.2d 52, 53 (Fla. 1994) ("We need not reach this issue [premeditation], however, because there was ample evidence supporting first-degree murder under a felony murder theory.").
Before the trial court, appellant conceded that there was sufficient evidence for there to be a prima facie case as to the charge of felony murder based upon the underlying robbery of the victim. The trial court submitted the charge of first-degree murder to the jury on theories of both premeditated and felony murder. The jury returned a special verdict finding appellant guilty under both theories. Although appellant's concession of the sufficiency of the evidence would ordinarily end the matter, we have reviewed this claim on its merits, and we find that there was sufficient evidence from which the trier of fact reasonably could conclude that appellant committed this murder during the commission of a robbery.
For example, in evidence is appellant's statement in which he related in detail how the murder occurred based upon his *1262 "dreams" about the murder. In this statement, appellant detailed a robbery followed by a murder. Further, in finding that this murder was committed during the commission of a robbery, the trial judge wrote in his sentencing order:
In [appellant's] dream, the person who killed John Galloway, a private security guard, the victim in this case, threatened the victim with a gun, stating, "I want your money." When the victim gave the wallet to the perpetrator and tried to use a phone at the security booth the perpetrator, who was laughing, fired hitting the victim in the chest. In this so-called dream sequence the perpetrator took the victim's wallet and an ATM card and attempted to use the ATM card.
The trial court then ruled that "[t]he jury clearly chose to believe the admission in which the Defendant described in detail a robbery followed by a shooting when the victim attempted to use the phone at the security station." We find that there was competent, substantial evidence to support the trial court's conclusion.
Moreover, we find this case similar to those cases in which we have affirmed felony murder convictions based upon robbery as the underlying felony and held that the evidence presented was sufficient to create a prima facie case for robbery and recognizing an inconsistency between the evidence and appellant's assertion that any theft occurred as an afterthought. See Voorhees v. State, 699 So.2d 602, 604 (Fla.1997) (taking and using victim's ATM card); Finney v. State, 660 So.2d 674, 680 (Fla.1995) (taking and pawning victim's VCR); Jones v. State, 652 So.2d 346, 349 (Fla.1995).
Police discovered that Mr. Galloway's left front pants pocket had been turned inside out, indicating that someone had gone through his pockets. Police also discovered that Mr. Galloway's wallet, containing an ATM card, a Shell gas station credit card, and a MasterCard, was missing. The evidence showed that the Shell card was used at around 12:36 a.m. to purchase gas and two quarts of oil. There was an attempted use of the ATM card at a Barnett Bank at approximately 1 a.m. Mr. Galloway's MasterCard was used to rent a motel room in Everglades City at approximately 4 a.m. on the morning of the murder.
Ms. Hess testified that, after appellant returned from the guard shack, they drove to the Shell gas station where she worked to purchase gasoline and two quarts of oil. She stated that she paid for the gas and oil with a credit card given to her by appellant and that she forged the name John Galloway, the name that appeared on the card, to the charge receipt.[14] She stated that they then drove to a bank, where appellant attempted unsuccessfully to use an ATM card. After that, they drove to Everglades City, where they rented a room. Again, Ms. Hess used a credit card given to her by appellant, and she forged the name John Galloway, the name that appeared on the card. This evidence, together with the detailed statements to which the trial court referred in his sentencing order, was clearly sufficient to present an issue for the jury to determine on the charge of felony murder predicated on a charge of robbery. See Sager v. State, 699 So.2d 619 (Fla.1997).[15] Accordingly, *1263 we affirm appellant's conviction for first-degree murder.

Penalty Phase

Prior Violent Felony Aggravator
Appellant contends that the trial court erred in finding as an aggravating factor that section 921.141(5)(b), Florida Statutes (1993) (convicted of a prior violent felony) was proven.[16] This aggravator was based on appellant's convictions of sexual activity with a child and lewd and lascivious assault, arising out of an incident involving his two nieces. See supra note 8.[17]
The State maintains that this aggravator was proven by the admission of evidence of crimes committed by appellant against his two nieces some two years after the murder. The court admitted into evidence certified copies of the charging information on two counts of sexual activity with a child and one count of lewd assault on a child and the judgment showing that appellant was found guilty on each count. These were acts in violation of sections 794.011 and 800.04, Florida Statutes (1993). However, the State did not present any evidence regarding the circumstances surrounding these crimes.
The trial court viewed these crimes as per se crimes of violence. The judge instructed the jury as a matter of law that: "The crimes of sexual activity with a child and lewd and lascivious assault are felonies involving the use or threat of violence to another person." Appellant argues in this appeal that the crimes charged in the information, sexual activity with a child and lewd assault, are not necessarily violent crimes as defined in section 921.141(5)(b). Appellant asserts that because the crimes were nonconsensual as a matter of law does not mean that force was used. Appellant points out that the charging information on the crimes alleged no threat or use of violence but only that the victims were over twelve and under eighteen and that appellant was in a position of familial or custodial authority. Appellant concludes that when the crime is not violent per se the court must look at the facts of the case, relying upon our decision in Lewis v. State, 398 So.2d 432 (Fla.1981) (crimes of breaking and entering with intent to commit felony, escape, grand larceny, and possession of firearm by convicted felon did not support section 921.141(5)(b) aggravator, which refers to life-threatening crimes in which the perpetrator comes in direct contact with a human victim).
Whether the trial court was correct in concluding that sexual activity with a child and lewd and lascivious assault are per se crimes of violence is an issue of first impression. Section 921.141(5)(b) reads: "The defendant was previously convicted of another capital felony or of a felony involving the use or threat of violence to the person." We have held that this aggravator attaches only to "life-threatening crimes in which the perpetrator comes in direct contact with a human victim." Johnson v. State, 720 So.2d 232, 237 (Fla. 1998) (quoting Lewis, 398 So.2d at 438); *1264 see Mahn v. State, 714 So.2d 391, 399 (Fla.1998).
The record reflects that two counts of sexual activity with a child were predicated on section 794.011(8)(b), Florida Statutes (1993), of the sexual battery statute, which states:
(8) Without regard to the willingness or consent of the victim, which is not a defense to prosecution under this subsection, a person who is in a position of familial or custodial authority to a person less than 18 years of age and who:
. . . .
(b) Engages in any act with that person while the person is 12 years of age or older but less than 18 years of age which constitutes sexual battery under paragraph (1)(h) commits a felony of the first degree....
"Sexual battery" is defined in subdivision (1)(h) to mean "oral, anal, or vaginal penetration by, or union with, the sexual organ of another ... by any other object." The Legislature in section 794.005 expressed its findings with respect to sexual battery:
The Legislature finds that the least serious battery offense ... was intended, and remains intended, to serve as the basic charge of sexual battery ... and that it was never intended that sexual battery offense ... require any force or violence beyond the force and violence that is inherent in the accomplishment of "penetration" or "union."

(Emphasis added.) We conclude that both the language of section 794.011(8)(b) and section 794.005 indicate the Legislature's intent to treat a violation of section 794.011 as implicitly involving violence or the threat of violence. Accordingly, we find no error with the trial court's instruction to the jury as to this offense.
However, the trial court also found that lewd assault on a child was a prior violent felony per se. Section 800.04(1), Florida Statutes (1993), states that it is a crime for a person to handle, fondle, or assault any child under the age of sixteen years in a lewd, lascivious, or indecent manner. However, because this crime does not include sexual battery within its definition and because, unlike sexual battery, the language does not indicate any inherent violence or threat of violence, we conclude this is not per se a crime of violence. Thus, the State had the burden of proving that this crime involved violence or the threat of violence under the actual circumstances in which it was committed.
In Johnson v. State, 465 So.2d 499 (Fla.1985), overruled on other grounds, In re Instructions in Criminal Cases, 652 So.2d 814 (Fla.1995), we stated that the "facts may be established by documentary evidence, including the charging or conviction documents, or by testimony, or by a combination of both." Id. at 505. Here, the State's information alleged that appellant "did unlawfully handle, fondle, or make an assault upon ... a child under the age of 16 years, in a lewd, lascivious or an indecent manner, by making child masturbate his penis to ejaculation." (Emphasis added.) We find that this allegation of force by "making" under which appellant was convicted provided a sufficient basis from which the trial court could have concluded that the crime involved the use or threat of violence. Although the trial court erred in instructing the jury that this was per se a crime of violence, we find that error harmless in light of the fact that the State introduced the information which contained an allegation of the use or threat of violence.

Mitigation Evidence
Next, appellant argues that the trial court erred by failing to find any *1265 statutory mitigation and by failing to assign sufficient weight to appellant's non-statutory mitigating circumstances. Appellant further contends that the trial court erred by ruling that appellant had not proven the statutory mitigating circumstance of "no significant history of prior criminal activity." In essence, the issue raised here is whether criminal activity actually committed after the murder but prior to the sentencing (i.e., appellant's sexual misconduct convictions) may be considered in determining the existence of the "no significant history of prior criminal activity" statutory mitigating circumstance.
In Ruffin v. State, 397 So.2d 277, 283 (Fla.1981), this Court held that "prior" meant before sentencing and not before the murder. In Scull v. State, 533 So.2d 1137, 1143 (Fla.1988), however, we held that crimes which were committed contemporaneously in the same criminal episode as the murder could not be considered as rebutting this statutory mitigator. We expressly held:
[W]e do not believe that a "history" of prior criminal conduct can be established by contemporaneous crimes, and we recede from language in Ruffin to the contrary.
Id. at 1143. In Santos v. State, 629 So.2d 838, 840 (Fla.1994), we cited Scull in support of our conclusion that "this mitigating factor must be found if a defendant had no significant history of criminal activity prior to the transaction in which the instant murder occurred." (Emphasis supplied.) We also applied this reasoning in Besaraba v. State, 656 So.2d 441, 446-47 (Fla.1995). Hence, we conclude that the trial court erred in not finding this statutory mitigator. However, in view of our holding on proportionality we find this error harmless.
We find no error regarding the trial court's findings and weighing of the other mitigating circumstances. Further, the weight assigned to a mitigating circumstance is within the trial court's discretion and is subject to the abuse of discretion standard. See Alston v. State, 723 So.2d 148, 162 (Fla.1998); Blanco v. State, 702 So.2d 1250 (Fla.1997); Foster v. State, 679 So.2d 747 (Fla.1996); Campbell v. State, 571 So.2d 415, 419 (Fla.1990).

Proportionality
As we have stated many times, "[o]ur proportionality review requires us to `consider the totality of circumstances in a case, and to compare it with other capital cases.'" Terry v. State, 668 So.2d 954, 965 (Fla.1996) (quoting Porter v. State, 564 So.2d 1060, 1064 (Fla.1990)); see also Tillman v. State, 591 So.2d 167, 169 (Fla. 1991). The purpose of our proportionality review is to guarantee that "the reasons present in one case will reach a similar result to that reached under similar circumstances in another case." State v. Dixon, 283 So.2d 1, 10 (Fla.1973). In carrying out this important task, we are constantly mindful that death "is a unique punishment in its finality," Dixon, 283 So.2d at 7, and therefore, "its application is reserved only for those cases where the most aggravating and least mitigating circumstances exist." Terry, 668 So.2d at 965; see also Dixon, 283 So.2d at 7. Under the circumstances present in this case, we cannot say that appellant's conduct places this case in the category reserved for the most aggravated, least mitigated murders warranting the death penalty.
The trial court here found only two aggravating factorsthat the murder was committed during the course of a robbery and that the defendant was previously convicted of a violent felony. The first aggravator (i.e., that the murder was committed *1266 during the course of a robbery) is based solely on the fact that appellant was engaged in the commission of a robbery when the killing occurred. As noted by the trial court in its sentencing order:
In [appellant's] dream, the person who killed John Galloway, a private security guard, the victim in this case, threatened the victim with a gun, stating, "I want your money." When the victim gave the wallet to the perpetrator and tried to use a phone at the security booth the perpetrator, who was laughing, fired hitting the victim in the chest. In this so-called dream sequence the perpetrator took the victim's wallet and an ATM card and attempted to use the ATM card.
In other words, this aggravator is based on the same incident which resulted in Galloway's death. In addition, appellant was separately convicted of this robbery and received an additional sentence for that crime. Further, the exact circumstances surrounding the robbery are unknown as there were no witnesses to the crime and the appellant's statements reflect a variety of bizarre scenarios.
The second aggravator (i.e., that appellant has previously been convicted of violent felonies) is based on appellant's prior convictions for sexual offenses against his two nieces. See supra pages 1262-64. While we agree that this is a valid legal aggravator based on the evidence submitted by the State, we cannot help but note that the state presented no facts as to the circumstances surrounding the offenses. Furthermore, the appellant's sister, the mother of the victims of appellant's abuse, testified extensively in support of appellant during the penalty phase of the trial, including offering testimony that she and her daughters have forgiven him for his conduct. See supra note 8.
We also cannot help but note that these offenses actually occurred two years after the murder of Galloway, for which appellant received substantial sentences. At the time Hess committed the murder in this case, however, he had no history of committing violent crimes. While we agree that sexual offenses involving violence clearly qualify as prior violent felonies, we cannot ignore the fact that Hess does not have a significant history of committing violent offenses and both sexual offenses occurred after the murder in this case. See Urbin v. State, 714 So.2d 411, 418 (Fla.1998). Thus, the aggravator in this case, albeit established, is not as "weighty" as it normally would be in cases where the defendant has a significant history of prior violent crimes, which includes prior murders. See, e.g., Ferrell v. State, 680 So.2d 390, 391 (Fla.1996) (finding single aggravating factor of prior violent felony "weighty" where factor was based on prior second-degree murder conviction bearing many similarities to murder committed in instant case); Hunter v. State, 660 So.2d 244, 253 (Fla.1995) (prior violent felony aggravator based on twelve prior felonies, four of which were prior felonies and eight of which occurred contemporaneously with the murder in the instant case); cf. Jorgenson v. State, 714 So.2d 423, 428 (Fla.1998) (holding that length of time between prior conviction (1967 second-degree murder) and present crime and factual circumstances surrounding prior conviction "mitigate[d] the weight that a prior violent felony would normally carry").
The two aggravators found in this case must be considered in comparison to the extensive evidence presented in mitigation. In addition, we have held that the trial court erred in not finding as statutory mitigation the fact that appellant had no significant history of criminal activity prior to this crime, an important statutory mitigation not considered by the trial court. *1267 Here, the trial court found and weighed sixteen nonstatutory mitigating factors. These factors include the following: (1) appellant is a loving son to his parents; (2) appellant is a loving brother to his siblings; (3) appellant maintained employment throughout most of his life; (4) appellant is a loving and caring father; (5) appellant provided financial support to his family and his siblings' families; (6) appellant lacked a male role model growing up; (7) appellant was traumatized when his two sons were taken from him; (8) appellant was ill at a young age which left him with a learning disability; (9) appellant was treated cruelly by his contemporaries due to his learning disabilities; (10) appellant accepts blame for things he did not do in order to keep loved ones out of trouble; (11) appellant cooperated with law enforcement; (12) the treatment of others involved in the case; (13) appellant was suffering from some mental or emotional disturbance when the murder was committed; (14) appellant's religious devotion; (15) appellant's potential life sentence; and (16) appellant maintained good jail and trial conduct.
Particularly noteworthy is the evidence that appellant has a history of learning disabilities, was considered ten years behind his chronological age, was considered borderline retarded during his school years and was placed in special education classes as a result of his mental or emotional infirmities. The record also reflects that appellant was diagnosed in 1991 as being chronically depressed and suffering from substantial mood swings, for which he was placed on prescription medication. As of the time of the penalty phase proceeding, appellant was still taking medication for depression and had been receiving counseling in jail since October of 1995. Based on this evidence, the trial court found that appellant was suffering from some mental or emotional disturbance at the time of the murder, to which it gave moderate weight. This finding is bolstered by the bizarre circumstances of this crime and appellant's numerous confusing statements. After considering the totality of the underlying circumstances in this case, we conclude that a consideration of the aggravation and mitigation clearly excludes this case from being one of the most aggravated and least mitigated murders for which the death penalty is reserved.
When the facts and circumstances in this case are compared to other capital cases involving a murder-robbery, we find that death is not the appropriate penalty. See Urbin v. State, 714 So.2d 411 (Fla. 1998) (vacating sentence of death where youthful age of defendant (17), disadvantaged childhood, and alcohol and substance abuse outweighed aggravating factorsthat defendant had been convicted of prior violent felony and that murder had been committed in course of robbery and for pecuniary gain); Johnson v. State, 720 So.2d 232 (Fla.1998) (vacating sentence of death where mitigating circumstances outweighed aggravating factors that murder was committed during course of robbery and defendant had previously been convicted of four violent felonies); Terry v. State, 668 So.2d 954 (Fla.1996) (vacating sentence of death where aggravating circumstances not extensive enough to outweigh mitigating circumstances); cf. Sinclair v. State, 657 So.2d 1138 (Fla. 1995) (vacating sentence of death where mitigation, including low intelligence and emotional disturbances, outweighed single aggravating factorthat murder was committed for pecuniary gain merged with murder committed during course of robbery); Thompson v. State, 647 So.2d 824 (Fla.1994) (vacating sentence of death where significant mitigation outweighed single aggravating factorthat the murder *1268 was committed in the course of a robbery).
Indeed, this case is very similar to Terry v. State. In Terry, the defendant robbed a gas station, during the course of which he shot and killed a customer. We upheld Terry's conviction for first-degree murder, but vacated his sentence of death because the crime was not among the most aggravated, least mitigated of capital cases. See 668 So.2d at 965. We reasoned that while the facts in the case clearly established that the murder occurred during a robbery, the actual circumstances surrounding the murder were unclear. See id. Furthermore, we found that while the case presented marginal mitigation, the aggravating factors were not extensive in light of the totality of the underlying circumstances. See id. at 965-66 (noting that aggravators were based on fact killing occurred during a robbery and co-felon, not defendant, committed assault simultaneously with murder). Viewed in this light, we held that Terry's actions did not satisfy the test set forth in Dixon for identifying which crimes are "the most aggravated, the most indefensible of crimes" for which punishment by death is warranted. See id. at 966. This case, of course, involves much more mitigation than was involved in Terry.
Similarly, in Johnson, the defendant was convicted of first-degree murder and robbery-related offenses for the shooting death of Willie Gaines. The trial court found two aggravators and several mitigators: (1) Johnson was twenty-two at the time of the crime; (2) Johnson voluntarily surrendered to the police; (3) Johnson had a troubled childhood; (4) Johnson was previously employed; (5) Johnson was respectful to his parents and neighbors; (6) Johnson had a young daughter; and (7) Johnson earned his GED and participated in high school athletics. We upheld his conviction for first-degree murder under both premeditated and felony murder theories, but vacated his sentence of death. See 720 So.2d at 236. In so concluding, we approved the trial court's finding that the murder was aggravated by the defendant's prior convictions of four violent felonies aggravated assault, aggravated battery, robbery with a firearm, and attempted murderand the fact the murder was committed during the course of a burglary. See id. at 237-38. However, we found that the prior violent felony aggravator was not strong when the circumstances surrounding the prior offenses were considered. See id. at 238. We reasoned that the aggravated assault charge was based on an offense committed by appellant against his brother and that his brother testified that he was not injured by the affray and that it occurred as a result of a misunderstanding. The two attempt charges resulted from appellant's conviction as a principal to the offenses committed by his brother contemporaneously with the murder of Gaines. See id. When we considered these factors with the mitigating evidence presented and similar other capital cases, we concluded that the crime committed by appellant was "not among those for which the death penalty is specifically reserved under State v. Dixon." Id.
Like the factual circumstances in Terry, the exact circumstances surrounding the robbery-murder in the instant case are unclear. Appellant provided several different recitations to the police as to how the murder occurred. The only other person allegedly present at the time of the crime was appellant's wife who did not actually witness the murder. And, as noted above, while the evidence supports a finding of two aggravating factors, those factors are not as compelling as we have found in other cases, especially in light of the totality of the aggravating and mitigating circumstances in this case.
*1269 Finally, we note that the mitigating evidence presented herein and found by the trial court is far more substantial than that presented in both Terry and Johnson. Indeed, based on the evidence presented, this clearly is not a case involving minimal or insignificant mitigation. Thus, we conclude that we are unable to say that this case stands out and qualifies as one of the most aggravated, least mitigated crimes for which the ultimate sanction of death is reserved.

State's Cross Appeal
The State argues that the trial court erred in allowing defense counsel to make an inappropriate argument to the jury. In his closing argument and over objection, defense counsel discussed the cases of Ted Bundy, Jeffrey Dahmer, and Charles Manson. This issue is controlled by our decision in Herring v. State, 446 So.2d 1049 (Fla.1984), receded from on other grounds, Rogers v. State, 511 So.2d 526, 533 (Fla.1987):
We have previously held that evidence concerning sentences imposed upon co-defendants must be admitted in the penalty phase in order to allow the jury to know all the facts and circumstances surrounding an offense and its participants. These cases do not hold, however, that the circumstances and sentences in other death penalty cases must be admitted in the sentencing phase of the trial. Evaluating the sentences of other defendants in unrelated crimes involves a number of variables. There is no requirement in [Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978)] for the admission of such evidence in the sentencing phase. What Lockett does require is the admission of evidence that establishes facts relevant to the defendant's character, his prior record, and the circumstances of the offense in issue. The jury's responsibility in the process is to make recommendations based on the circumstances of the offense and the character and background of the defendant. The trial court, in determining the sentence to impose, must use its judicial experience in evaluating and weighing the aggravating and mitigating circumstances with the recommendation of the jury. The use of sentences imposed on other defendants relates to the proportionality of the sentence and is an appropriate element to be considered by the trial judge in imposing sentence upon the defendant, but is not a matter for the jury. This Court also has the responsibility to determine whether the sentence is proportionate with other death penalty cases.
Id. at 1056 (citations omitted). As in Herring, we agree with the State that defense counsel's argument to the jury regarding the sentences of specifically identified killers in other capital cases was not relevant to the determination of the appropriate sentence for appellant's role in the instant murder.

III. CONCLUSION
Accordingly, we affirm appellant's convictions of first-degree murder and robbery with a firearm. However, we vacate appellant's sentence of death and remand this case to the trial court to impose a sentence of life imprisonment without possibility of parole for twenty-five years.[18]
It is so ordered.
*1270 ANSTEAD, PARIENTE, and LEWIS, JJ., concur.
SHAW, J., concurs as to the conviction and concurs in result only as to the sentence.
HARDING, J., concurs in part and dissents in part with an opinion, in which WELLS, C.J., and QUINCE, J., concur.
HARDING, J., concurring in part and dissenting in part.
I concur with the majority's affirmance of Hess's conviction for first-degree murder. I dissent, however, with the majority's analysis and conclusion that the death sentence is disproportionate. The majority concludes that the prior violent felony aggravator is "not as `weighty' as it normally would be in cases where the defendant has a significant history of prior violent crimes." Majority op. at 1266. I cannot agree that a felony that is committed after a murder is per se less weighty than a felony committed prior to the murder. The prior violent felony aggravator requires only that there be a conviction at the time of sentencing. See King v. State, 390 So.2d 315, 320 (Fla.1980). The weight to be given to this aggravator should depend on the nature and circumstances of the underlying felony, not on whether the felony was committed before or after the murder. The majority tries to support its position by citing to Jorgenson v. State, 714 So.2d 423 (Fla.1998), and Urbin v. State, 714 So.2d 411 (Fla.1998). In Jorgenson, there was only one aggravatora prior second-degree murder conviction from 1967. We did an analysis of the prior violent felony on the facts and found it "significant that Jorgenson did not have any criminal convictions from the time he was released from prison in 1973 until he was arrested in 1993 for a drug offense and the present crime." See id. at 428. We ultimately concluded that the death penalty was disproportionate. How the language in Jorgenson can be used to justify the majority's holding defies logic and reasoned judgment. To the extent that Urbin can be read to imply that the prior violent felony aggravator is less weighty if the underlying felony is committed after the murder, I disagree. Further, Urbin is distinguished from the instant case. In Urbin, the trial court found the following two statutory mitigators: (1) Urbin was seventeen years old at the time of the crime, and (2) Urban's capacity to appreciate the criminality of his conduct was substantially impaired at the time of the shooting. The existence of these statutory mitigators was the primary reason for this Court's conclusion that the death sentence was disproportionate.
At the time of sentencing in the present case, Hess had been convicted for sexual offenses against his two nieces. There is nothing about the nature or circumstances of these felonies that would require us to give this aggravator less weight. Accordingly, I would find the death sentence proportionate.
WELLS, C.J., and QUINCE, J., concur.
NOTES
[1] Police had not released any of the details of the shooting to the media at the time of this interview.
[2] The charges involved appellant's two nieces in sexual misconduct incidents which allegedly occurred in Lee County, Florida. Deputy Crone was also assigned to that case. Appellant waived extradition from Michigan on those charges. On March 31, 1995, Deputy Crone, accompanied by Deputy Stanforth, traveled to Michigan to escort appellant back to Lee County.
[3] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[4] Deputy Stanforth testified that on April 5 he saw appellant, at which time appellant requested to talk with Deputy Crone. However, appellant did not indicate why he wanted to talk with Deputy Crone. Deputy Stanforth testified he called and told Deputy Crone of the request that evening. Appellant was transferred to the Lee County's Sheriff's office on April 10 to look at some photographs of suspects and placed in one of the interview rooms. On that same day, a Deputy Griner transported Mr. Sawyer to the sheriff's office. When Deputy Griner got to the sheriff's office, appellant was already in one of the interview rooms. Deputy Griner went into that room and spoke with him. He had known appellant from an incident reported by appellant, to which Deputy Griner had responded, while appellant was employed at a bus barn as a security guard. Deputy Griner said that his conversation with appellant was general in natureabout telling the truthand he stated that "nothing could ever be resolved in someone's life until the truth was known." Deputy Griner said that appellant at first said he was telling the truth but that no one would believe him. Appellant then said "he wasn't telling the truth" and said that he wanted to speak with Deputy Crone to tell him the truth. Deputy Crone was at that time interviewing Mr. Sawyer in another interview room. According to Deputy Crone, while he was interviewing Mr. Sawyer, Deputy Griner knocked on the door and advised him that appellant wanted to confess.
[5] Although appellant stated that he was on his way to relieve Mr. Galloway, other evidence established that Omar Security did not provide security protection for Lake Fairways, which provided for its own security.
[6] Ms. Hess testified that she did not notice anything unusual about appellant's uniform after leaving Lake Fairways or after the next time she washed the uniform.
[7] She stated that on the night of May 11, 1993, appellant picked her up sometime between 11:30 p.m. and midnight at the Shell station where she worked. Appellant then drove to Lake Fairways, where he parked the car 100 feet from the entrance on the shoulder of Highway 41. Appellant then exited the car and walked in the direction of the guard house. Appellant was gone approximately one-half hour. During this time, she stated that she heard what she thought were two gunshots in the distance. When appellant returned he acted nervous and she noticed what appeared to be the outline of a handgun in his waistband. She said that appellant then drove the car south on Highway 41. While stopped on a bridge, appellant got out and appeared to look over the side of the bridge. She said she did not see the bulge in his waistband when he returned to the car. They then continued south to the Shell station where she worked. She testified that she pumped gas and then paid with a credit card appellant gave her. The name that appeared on the credit card was John Galloway, which she used as the name for signing the credit receipt. She further testified that they then drove to a bank, where appellant unsuccessfully attempted to use an ATM card. Ms. Hess testified they then drove to a motel in Everglades City, renting a motel room using Mr. Galloway's MasterCard.
[8] Appellant's brief, unchallenged by appellee, summarizes the sister's testimony:

John Hess' sister, Julie Ann Teachworth, St. Louis, Michigan, brought letters from John's parents, other siblings, family members and friends. She said they grew up in Illinois and Michigan with two loving, caring parents. Their father had three jobs so was rarely home. There were three girls and two boys, all born within five years. Julie was the oldest child, and John was in the middle.
John had numerous problems as a child. He contracted a rare virus in the hospital, and his lungs started to collapse. He developed fluid on the brain. Because of this, John had learning and behavioral problems and was hyperactive. He was borderline retarded and was placed in special education. John continuously took the blame for things his siblings had done.
John Hess only went to the tenth grade in school because of his first wife, Laurie Wilson, who was also in special education. When she got in trouble, John would take the blame. Laurie quit school at sixteen and John moved in with her when he was seventeen. He was on probation because of an incident during which he hit the chief of police in the mouth while trying to protect Laurie. He was in jail for that incident on his 16th birthday.
After living together off and on for about three years, John and Laurie married, and soon had two boysRobert Lee and Billy Joe. Although Laurie already had a daughter, she was taken by HRS. John loved the boys and was both a mother and father to them. He did not work because he had to care for them. Laurie was schizophrenic and dangerous and it was not safe to leave the boys with her.
John and Laurie were married about three years. John worked and Laurie received SSI and AFDC. John's sister saw numerous injuries John sustained as a result of physical attacks by his wife. Sometimes he went to the hospital. Laurie held him against the furnace until he was burned. Another time she broke his hand. She threw him off the house. She broke his knee. Nevertheless, John loved Laurie. He took the blame for whatever she did. He once spent 90 days in jail because Laurie chased him out of the house with an ax while he was naked. He was arrested for indecent exposure.
When Robert was almost two and Billy Joe almost a year old, John's sons were taken by HRS and placed in foster care. Laurie had deteriorated and John could not care for them and support the family. The social worker said he could have the boys back if he ended his marriage to Laurie but did not do so. They said that he had a character disorder. Hess relinquished his parental rights in 1988, in exchange for the right to have contact with the boys by letter and photos.
Devastated by the loss of his children, John went into a deep depression. He became moody and no longer thought clearly. Three years later, he began to take prescription drugs for depression. Although the medication helped, nothing would cure his depression. John's sister, Christine, wrote that, after John lost the boys, the stories got bigger, the lies got longer, and the bragging got worse.
In Michigan, John worked mostly as a dishwasher. Work was scarce and they sometimes had to rely on public assistance. About a year after his divorce from Laurie, John married Juli. They had no children. John worried about Juli staying out too late. Both worked and had no financial problems. Juli controlled John.
Teachworth and her family moved to Florida in 1991, several months before John and Juli. John and Juli stayed with them about six months. After that, John stopped by to see his sister every day. He was arrested in Michigan in April of 1995, while visiting his parents, for sexual misconduct with her daughters. His sister said that she and her daughters had forgiven John. The incident happened only one weekend. Teachworth said that John knew right from wrong, but loved to protect people by taking the blame. It was not unusual for him to make things up.
Initial Brief of Appellant at 31-33 (footnotes and citations omitted) (record citations omitted).
[9] Appellant raises the following issues: (1) whether the trial court erred in failing to suppress his confession; (2) whether the trial court erred in denying appellant's motion for a judgment of acquittal on the charge of premeditated murder; (3) whether the State presented sufficient evidence to sustain a charge of robbery, which served as the predicate felony for the felony murder charge; (4) whether this Court should vacate appellant's convictions and discharge him from further prosecution; (5) whether the trial court erred in finding the two aggravating circumstances; (6) whether the trial court erred in dealing with the mitigating circumstances; and (7) whether death is a proportional sentence.
[10] The State asserts that the trial court erred in allowing defense counsel to make a proportionality argument to the jury.
[11] Appellant also claims the trial court erred in denying his motion to suppress because the confession was coerced. We find that this claim is procedurally barred because defense counsel did not raise the issue of voluntariness below. See San Martin v. State, 705 So.2d 1337, 1345 (Fla.1997) ("[W]e note that San Martin's intelligence level was never argued to the trial court as a basis for suppressing the statements. Thus, that issue is not available for appellate review."); Steinhorst v. State, 412 So.2d 332, 338 (Fla.1982).
[12] Deputy Crone testified that he was not aware of the document until after April 12, 1995. Deputy Crone further stated that each time he talked with appellant, on April 10, 11, and 12, he advised appellant of his Miranda rights, and appellant never requested counsel or told him that he had signed a request for counsel as to the Galloway case.

As set forth earlier, Deputy Stanforth testified that on April 5 he saw appellant, at which time appellant requested to talk with Deputy Crone. However, appellant did not indicate why he wanted to talk with Deputy Crone. Deputy Stanforth testified he called and told Deputy Crone of the request that evening. On April 10, 1995, Deputy Crone stated that he had appellant transferred to the police station from the jail to look at some pictures to determine who shot Galloway. Griner was to take Sawyer, the person appellant stated was involved in the murder, from the East District station to the Criminal Investigations Division (CID). At CID, Griner stated that he saw appellant waiting in an interrogation room. Griner and appellant knew each other. Griner testified that he approached appellant and began talking to him. During their conversation, appellant told Griner, "I want to tell the truth. I want to talk to Randy Crone." Griner advised Deputy Crone, who was interviewing Sawyer, of appellant's wishes. Deputy Crone advised appellant of his Miranda rights. Appellant then admitted to shooting Galloway but stated that it was an accident. The following day appellant led police through a videotaped reenactment of the murder, during which appellant stated that he shot Mr. Galloway accidentally when Mr. Galloway forcibly attempted to remove him from the property. Appellant made further incriminating statements on April 12, 1995.
[13] We agree with appellant that the trial court erred in not following Guthrie, the then-prevailing law in that circuit. However, we find the error harmless in view of our subsequent ruling in Sapp v. State, 690 So.2d 581 (Fla.1997).
[14] Deputy Allen testified that he and his partner drove from Lake Fairways to the Shell gas station and, based on this endeavor, he testified that he believed appellant had sufficient time from the time the murder was approximated in which to drive to the gas station and be there by 12:36 a.m.
[15] We distinguish Mahn v. State, 714 So.2d 391 (Fla.1998), relied upon by appellant, because the evidence in that case showed that "the homicides appear[ed] to have been the product of Mahn's mental and emotional disturbance and prompted by jealousy for his father's attention." Id. at 397.
[16] Appellant also challenges the trial court's finding that the murder was committed during the commission of a robbery as an additional aggravating factor. In light of our discussion and holding on the sufficiency of the evidence to support a felony murder conviction based upon robbery, we reject appellant's claim that the trial court erred in finding that the murder took place during a robbery.
[17] At the time of the offense, Hess's nieces were eleven and twelve years of age.
[18] Because Hess committed this crime in 1993, he must be sentenced in accordance with the statutes in effect at that time. Under the 1993 statutes, capital felonies were punished either by a sentence of death or by life imprisonment without possibility of parole for twenty-five years. See § 775.082(1), Fla. Stat. (1993).