PER CURIAM.
 

 We have on appeal a judgment of conviction of William Frank Davis for two counts of first-degree murder and two sentences of death for the fatal stabbing of his neighbor, Alice Jean Albin, and her sixteen-year-old daughter, Loretta Ann Wren, in August 2003. We have jurisdiction.
 
 See
 
 art. V, § 3(b)(1), Fla. Const. For the reasons that follow, we affirm the convictions and sentences.
 

 I. FACTS AND PROCEDURAL HISTORY
 

 The evidence presented at the trial of appellant William Frank Davis revealed the following. On behalf of the State, Detective Gary Stucki, a homicide detective with the Jacksonville Sheriffs Office (JSO), testified that he interviewed Davis on August 21, 2003. Detective Stucki testified that Davis told him that Davis knew the victims, Albin and Wren, because he had previously had a relationship with Al-bin’s other daughter Amy Ware. Davis and the victims lived in the same trailer community. Detective Stucki testified that initially Davis told him and Detective Mark Romano of the JSO that Davis twice visited with Albin and Wren late in the evening of August 20, 2003, or early in the morning of August 21, 2003. Davis told the officers that while he was at the victims’ home the second time, a white male in his late thirties entered the home and attacked Albin and Wren. Davis claimed to have fought with the white male before escaping the trailer. Upon further questioning, Davis repeated a substantially similar story. Later, when asked if he was “going to tell the truth,” Davis responded by asking for a recorder. Detective Stucki retrieved a tape recorder, and Davis told a different story explaining the stábbings. Detective David Meacham, also a homicide detective with the JSO, videotaped this statement. The videotape was played for the jury.
 

 In the videotaped statement, Davis admitted to killing Albin and Wren, apologized for lying, and explained that “it’s like it’s a different me with a knife.” He stated that he was sorry and that he knew what he did was wrong but could not explain why he killed the women. After a break, Davis gave the detectives a more detailed account of the attack. Davis explained that he walked several blocks to the victims’ trailer carrying a “sauté” knife and knocked on their door, which Wren answered. While holding the knife where she could not see it, Davis briefly questioned Wren about her sister. Davis stabbed Wren and forced his way inside. He chased Wren into the trailer, continuing to stab her. The sauté knife broke while Davis was stabbing Wren, so he acquired another knife. When Albin entered the kitchen area, Davis “just went to her next.” Davis acquired a third knife after the second knife broke while he was stabbing Albin. Albin’s young grandson lived with the victims and was in the trailer at the time of the attack, but was not harmed by Davis.
 

 
 *956
 
 Davis admitted that after stabbing the victims, he tried to wash his hands, tried to clean some of the blood from the kitchen floor, covered the victim’s bodies, and locked the front door as he left. Davis explained that he took some of the bloodied knives home and buried them outside his trailer and put his shoes and some of the clothes he wore during the attack in the woods near his home. He stated that because he had been injured during the attack, he used a flashlight to see whether he had left a trail of blood outside his trailer. Detective Stucki asked Davis why he killed Albín and Wren. Davis did not provide a reason or motive. Detective Stucki also asked when Davis decided to commit the homicides, but Davis’s response was inaudible. When asked if he knew what he was going to do when he walked to the victims’ trailer, Davis responded, “I didn’t know if I was going to do it.”
 

 After the videotaped interview, Detective Stucki asked Davis more questions. Detective Stucki testified that during that interview, Davis stated that he went to the victims’ trailer between midnight and 1 a.m. and that he wore extra clothing because he knew he was going to get his clothes bloody and wanted to be able to change inside the trailer.
 

 James Armstrong, one of Davis’s roommates at the time of the murders, testified about his knowledge of Davis’s behavior during the evening of August 20, 2003, and the early morning of August 21, 2003. He testified that Davis arrived home around 6 or 7 p.m. that evening and “[sjeemed like he was in a good mood.” Armstrong heard Davis leave later that evening, and when he returned, Armstrong heard Davis “rustling around in” the silverware drawer before leaving again. When Davis returned the next time, he asked Armstrong if he could borrow a flashlight and then left yet again. When Davis returned for the final time that evening, he made a “beeline” for his bedroom and took a shower.
 

 Larry A. Denton of the Biology Section of the Florida Department of Law Enforcement (FDLE) testified as an expert in serology DNA and population statistics. He testified as follows about DNA testing performed in this case. A mixture of DNA was found on a knife recovered from the victims’ kitchen floor. The major contributor to that DNA was Davis. DNA matching Albin was found on blue jeans recovered from a bag in the woods near Davis’s home. A mixture of DNA was present on a knife blade found in the pocket of khaki shorts recovered from Davis’s home, of which Wren was the major contributor. Maria Concepcion Bio Puro, a crime laboratory analyst in FDLE’s Biology Section, assisted in analyzing the physical evidence collected in this case and testified as an expert about population statistics. Puro found DNA matching Davis on a light switch plate from the victims’ trailer. Heather Velez, who worked for FDLE in 2003, testified that a fracture match analysis on two pieces of knife blade, one piece recovered from the victims’ kitchen sink and the other from the pocket of khaki shorts known to belong to Davis, showed that the pieces were once a single knife.
 

 William Davis was the only witness to testify for the defense. Davis testified that when he committed the homicides, he had no control over his physical body and that he could only see and hear, not feel or think. When asked why he went to the victims’ home, Davis answered, “I had no physical control over what I was doing.” Davis testified that he remembered “seeing [himself] sit down on their patio” before knocking on the victims’ door, but he stated that he could not explain what he
 
 *957
 
 was feeling as he sat on the patio. He estimated that he sat there for “a minute.” Davis testified that he heard a voice say, “I dare you to do it,” after which he knocked on the door. When asked why he went toward Wren with the knife, Davis answered, “Because I was possessed by a force, an evil one.” Davis testified that he did not know why he went to the victims’ trailer rather than another trailer, he had never thought about killing the victims before it happened, and he did not feel any animosity toward the victims before that night.
 

 Davis stated that when he woke the next morning, he “just had a memory of a dream” and saw visions of blood on a wall and a little boy. He testified that he was reminded of what had happened by “[t]he knives that was laying on the hamper [and] the cut on my hand.” Davis convinced his roommate Armstrong to go with him to the victims’ trailer by telling Armstrong the story that an ex-boyfriend of one of the women had attacked Davis and the women the night before. After Davis and Armstrong went to the trailer and discovered the bodies, Armstrong contacted law enforcement and told Davis to go home. Davis explained that it was at this time that he buried the knives outside of his trailer under some tires and poured gasoline on the tires to prevent dogs from digging there.
 

 On May 10, 2006, by special verdict forms, the jury found Davis guilty of each count of first-degree murder under the theory of premeditated murder and under the theory of felony murder.
 

 The trial court conducted a penalty phase during which the State and the defense presented evidence. The defense presented three mental health experts, several lay witnesses, and Davis. Psychologist Dr. Harry Krop testified for the defense as an expert witness in the field of forensic clinical psychology and neuropsy-chology. Dr. Erop opined that Davis did not suffer from any major mental illness, although he had suffered from depression, attention deficit disorder (ADD), and a specific learning disability. Dr. Krop’s testing indicated that Davis had an IQ of 85 and suffered from significant frontal lobe deficits. Dr. Krop explained that “individuals with frontal lobe [deficits] often don’t make the right choices and it’s not because they choose to do the wrong thing, but because they just don’t have the full capacity to think through all the options and then make the right decision.” Dr. Krop testified that Davis had a mental age of around sixteen.
 

 Regarding the murders, Dr. Krop testified that when he first met with Davis in September 2003, Davis used phrases like “it was like a dream” or “like watching himself in a movie.” Dr. Krop opined that what Davis was describing was a phenomenon known as disassociation. He explained that “[w]hen somebody is engaged in something out of character, something that’s awful, one of the ways that [the psyche] deals with that is to sort of separate the person from what he or she is doing.” Dr. Krop testified that he believed that Davis was in a dissociated state at the time of the murders, but he “was not buying that [Davis] did not have control at the time.” While he considered Davis to be impulsive, Dr. Krop testified that “it’s hard to say whether this [crime] was impulsive or not.” He added that while a “person’s judgment could be affected by frontal lobe [deficits] typically a person just doesn’t go off and do something without something precipitating it.” When asked whether Davis was under the influence of an extreme mental or emotional disturbance at the time of the murders, Dr. Krop testified that Davis “was in [a] dissociative state at the time which cer
 
 *958
 
 tainly reflects a person who is in considerable emotional distress. I feel that his judgment was compromised. And again in part because I can’t see any rational motive for what happened, I would not use the word extreme.” When asked if he was of the opinion that Davis was substantially impaired at the time of the crime, Dr. Krop answered, “I don’t like to speculate on such an important issue. I think that certainly there was impairment there or else he would not have been dissociating, but to the degree is very difficult for me to provide at this time.”
 

 Psychiatrist Richard G. Dudley, Jr., testified for the defense as an expert in psychiatry. Dr. Dudley described the information about Davis’s childhood as conflicting — ranging from Davis having had a normal childhood to him having experienced “pretty severe psychological abuse.” Dr. Dudley explained that Davis’s school record documented organic brain impairment, speech and language difficulties, depression, anxiety, and self-esteem issues. Dr. Dudley opined that Davis’s behavioral and emotional problems were characteristic of children who have “lacked parenting [and] have been abused and neglected in various ways.” Dr. Dudley stated that Davis’s psychological and emotional problems became worse in adolescence, when he began to experience “irrational fears,” “irrational behaviors,” and “parahypnotic sorts of experiences ... before he goes to sleep where he’s hearing these voices and then attaching certain sorts of meanings to that.” Dr. Dudley opined that during adolescence, Davis became an unstable person, with a “fairly fragile kind of touch on what’s real and what’s not real.” Dr. Dudley opined that when Davis was twenty years old, he was functioning at best like a fifteen- or sixteen-year-old.
 

 When asked if he was able to form any opinion about Davis’s mental health at the time of the murders, Dr. Dudley answered that Davis suffered from “pretty severe cognitive deficits” and “pretty severe borderline personality disorder,” resulting in “vulnerability for transient deteriorations [and] brief psychotic episodes.” Dr. Dudley opined that the combination of disorders constituted an “extreme and significant psychiatric condition.” However, Dr. Dudley clarified that these disorders are a constant condition and that he did not have enough information to say if Davis experienced a psychotic deterioration at the time of the crime. He explained that, while stressful situations can trigger psychotic compensation or dissociative phenomena, “unless you’re actually there when he’s having [a dissociative episode] you’re not able to confirm that he’s having it.”
 

 Psychologist Dr. Phillip Randolph Yates testified for the defense as an expert in psychology and primarily discussed Davis’s school career. Dr. Yates testified that in 1989, Davis was given an IQ test and received an overall score of 76. Dr. Yates opined that Davis suffered from attention deficit hyperactivity disorder (ADHD), and that his behavior in school indicated frontal lobe problems. He stated that Davis was intellectually two or three years behind his peers and academically six or seven years behind his peers when he quit school at the age of seventeen. Dr. Yates testified in detail about Davis’s behavioral referrals in school, stating that most were for disobedience, such as not following the school’s dress code, not following directions, and disrupting class, but that some were for more serious infractions, including a fist fight in September of 1998 and threatening a teacher in January of 2000.
 

 In addition to these experts, the defense called two of Davis’s former special education teachers, who testified that Davis was an unhappy child. Many of Davis’s
 
 *959
 
 relatives and family friends testified about Davis’s character and childhood. Only one relative, Davis’s maternal aunt, Toni Rodriguez, testified that she had observed Davis act violently. Rodriguez testified that Davis sometimes fought with her son Pietro. Several of Davis’s coworkers from the automobile lot where he worked as a detailer testified that Davis was polite, respectful, and a good worker. They testified that Davis had worked during the day on August 20, 2003, and had seemed normal. Finally, Davis again testified on his own behalf. He apologized to his family and the victims’ family.
 

 In rebuttal, the State called four law enforcement officers from the JSO’s Pretrial Detention Facility to testify about Davis’s behavior after his arrest. Two officers testified that they observed Davis in fist fights with other inmates. The third officer testified that Davis broke a restraint chair. The fourth officer testified that Davis once put a toothpaste cap in his cell locking mechanism, causing the cell door to not lock properly.
 

 On May 13, 2006, the jury recommended the death sentence for each murder by a nine-to-three vote. After conducting a hearing pursuant to
 
 Spencer v. State,
 
 615 So.2d 688 (Fla.1993), the trial court sentenced Davis to death for both murders.
 
 State v. Davis,
 
 Case No. 16-2003-CF-10469-AXXX-MA (Fla. 4th Cir. order filed Aug. 15, 2006) (Sentencing Order). On each count, the trial court found and assigned weight to four aggravating factors,
 
 [1]
 
 three statutory mitigating factors,
 
 [2]
 
 and twenty-seven nonstatutory factors.
 
 [3]
 

 Id.
 
 at 18-80.
 

 
 *960
 
 In this appeal, Davis challenges his death sentence but does not raise any guilt-phase claims. Davis argues that (A) the trial court erred by instructing the jury on the aggravating circumstance of cold, calculated, and premeditated (CCP), by allowing the prosecutor to argue this aggravator to the jury, and by finding this aggravating circumstance; (B) the trial court erred in failing to consider and weigh evidence of Davis’s impaired capacity as a nonstatutory mitigating factor; (C) the trial court erred in allowing the prosecutor to argue that school fights and Davis’s conduct in jail after the homicide could be used to reduce the weight of the mitigating circumstance of no significant history of prior criminal activity and in reducing the weight of this mitigating factor based on that evidence; (D) the death penalty is not warranted in this case; and (E) the trial court erred in sentencing Davis to death because Florida’s capital sentencing proceedings are unconstitutional under the Sixth Amendment of the United States Constitution pursuant to
 
 Ring v. Arizona,
 
 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). In addition to considering Davis’s arguments on appeal, this Court reviews the record to confirm that sufficient evidence supports the jury’s verdict.
 
 See
 
 Fla. R.App. P. 9.142(a)(6).
 

 II. Analysis
 

 A. CCP Aggravating Factor
 

 Davis argues that the trial court erred in allowing the State to argue the CCP aggravating factor to the jury during closing statements, erred in instructing the jury on the factor, and erred in finding the factor to have been proven. To establish the CCP aggravator, the State must prove beyond a reasonable doubt that (1) the killing was the product of cool and calm reflection and not an act prompted by emotional frenzy, panic, or a fit of rage (cold); (2) the defendant had a careful plan or prearranged design to commit murder before the fatal incident (calculated); (3) the defendant exhibited heightened premeditation (premeditated); and (4) the murder was committed with no pretext of legal or moral justification. § 921.141(5)(i), Fla. Stat. (2003);
 
 Pearce v. State,
 
 880 So.2d 561, 575-76 (Fla.2004). “[0]ur task on appeal is to review the record to determine whether the trial court applied the right rule of law for each aggravating circumstance and, if so, whether competent substantial evidence supports its finding.”
 
 Lynch v. State,
 
 841 So.2d 362, 368 (Fla.2003) (quoting
 
 Way v. State,
 
 760 So.2d 903, 918 (Fla.2000)).
 

 In this case, the trial court based its finding that the CCP factor was proven in the murder of Wren on the following factual findings: Davis carried a knife with him to the victims’ trailer; Davis walked approximately 600 yards to the trailer; Davis told law enforcement officers that he wore extra clothing because he wanted to be able to change out of bloody clothing before leaving the trailer; Davis carried with him a bag in which to place his bloody clothes; Davis sat on the victims’ front steps for approximately two to thirty minutes contemplating his next actions; Davis
 
 *961
 
 hid the knife while knocking on the door; Davis forced his way into the trailer after asking Wren a few questions; Davis stopped stabbing Wren to stab Albin when she entered the room; Davis stabbed Wren sixteen times while she struggled; Davis picked up a new knife from the kitchen floor after his knife broke; Davis told Dr. Krop that he attempted to strangle Wren after discovering that she was still alive; Dr. Krop did not testify that Davis’s ADD or frontal lobe damage rendered him unable to plan on the night of the murder; and Davis did not harm the little boy who lived with the victims. Sentencing Order at 23-25. The trial court made virtually identical factual findings in analyzing the CCP factor for the murder of Albin, with the additional findings that Davis stabbed Albin eighteen times and that he obtained a third knife when the second knife broke.
 
 Id.
 
 at 31-34.
 

 Davis argues that several of these factual findings are not supported by the record. Davis is correct that while there is evidence that Davis sat on the victims’ front steps before knocking, there is no evidence that he sat there for two to thirty minutes contemplating his next actions. In reviewing the trial court’s finding of CCP, this Court has considered Davis’s admission that he paused on the victims’ front stoop before knocking, but with the understanding that the pause may have been as brief as a “minute” as Davis testified. Davis’s other arguments about the factual accuracy of the trial court’s order are without merit. There is competent, substantial evidence supporting the trial court’s findings that Davis wore extra clothing to the victims’ trailer and carried a black bag with him to the trailer in anticipation of filling the bag with bloody clothing.
 

 After reviewing the record, we conclude that that the trial court applied the right rule of law and that competent, substantial evidence supports the trial court’s finding of CCP. While the trial court found that Davis was experiencing extreme mental or emotional distress when he committed the murders, the evidence as a whole established that CCP was applicable.
 

 The factual circumstances of the instant murders are comparable to those of a recent case where this Court held that CCP was properly found by the trial court. In
 
 Carter v. State,
 
 980 So.2d 473 (Fla.),
 
 cert. denied,
 
 — U.S.-, 129 S.Ct. 400, 172 L.Ed.2d 292 (2008), the defendant admitted driving to the home of Elizabeth Reed, his ex-fiancée, with a loaded rifle and entering the home with the rifle concealed against his leg and his finger on the trigger. Once in the home, Carter demanded that Reed answer questions about their relationship. When Reed reached for the rifle, Carter struggled and the gun discharged, fatally striking Reed’s daughter. Carter then deliberately shot Reed and her boyfriend multiple times at close range. This Court found that the record sufficiently supported the finding of CCP for the murders of Reed and her boyfriend.
 
 Id.
 
 at 482.
 

 The cases are similar in that both defendants knew their victims and deliberately went to their homes. Both defendants armed themselves in advance. Just as Carter concealed his rifle by placing it against his leg, Davis testified that as he knocked on the victims’ door he held the knife in his hand but “not like where [Wren] could see it.” Also like Carter, Davis refrained from violence long enough to ask a few questions of one of the victims. Davis’s heightened premeditation and his prearranged design to kill are further evidenced by his wearing extra clothes and taking a bag in which to place clothes that became bloodied.
 

 
 *962
 
 This evidence refutes Davis’s argument on appeal that the crime was impulsive and the product of an emotional disturbance, rather than calculated and demonstrative of heightened premeditation. Davis’s case is distinguishable from
 
 Almeida v. State,
 
 748 So.2d 922 (Fla.1999),
 
 Maulden v. State,
 
 617 So.2d 298 (Fla.1993), and
 
 Santos v. State,
 
 691 So.2d 160 (Fla.1991). While the trial court found that Davis was suffering from extreme mental or emotional distress at the time of the murders, there was no evidence that Davis’s ability to control his conduct and understand his actions was impaired due to intoxication or severe mental illness, such as schizophrenia or psychosis.
 

 Overall, given that the record supports the findings that Davis carried to the victims’ trailer a knife, extra clothing, and a bag in which to hide bloody clothing, paused on the steps, and was not so disturbed as to not be able to control his behavior, we find that competent, substantial evidence supports the trial court’s finding that the CCP aggravating factor was applicable to these murders.
 
 [4]
 

 B. Impaired Capacity as Nonstatutory Mitigating Factor
 

 Davis argues that the trial court should have considered and weighed his “impaired capacity” as a nonstatutory mitigating factor. We disagree. The trial court did not err in failing to consider and weigh evidence of Davis’s impaired capacity during the murder as a nonstatutory mitigating factor because Davis did not argue that factor as a proposed nonstatu-tory mitigating factor to the trial court.
 

 Under Florida law, “[w]hen addressing mitigating circumstances, the sentencing court must expressly evaluate in its written order each mitigating circumstance proposed by the defendant to determine whether it is supported by the evidence and whether, in the case of non-statutory factors, it is truly of a mitigating nature.”
 
 Griffin v. State,
 
 820 So.2d 906, 913 (Fla.2002) (quoting
 
 Campbell v. State,
 
 571 So.2d 415, 419-20 (Fla.1990)). In
 
 Lucas v. State,
 
 568 So.2d 18, 23-24 (Fla.1990), we explained that a defendant must raise a proposed nonstatutory mitigating circumstance before the trial court in order to challenge on appeal the trial court’s decision about that nonstatutory mitigating factor:
 

 As the state points out, Lucas did not point out to the trial court all of the nonstatutory mitigating circumstances he now faults the court for not considering. Because nonstatutory mitigating evidence is so individualized, the defense must share the burden and identify for the court the specific nonstatutory mitigating circumstances it is attempting to establish. This is not too much to ask if the court is to perform the meaningful
 
 *963
 
 analysis required in considering all the applicable aggravating and mitigating circumstances.
 

 Pursuant to
 
 Lucas,
 
 a defendant may not manufacture a sentencing error by not requesting that the trial court specifically consider unproven statutory mitigating factors as potential nonstatutory mitigating factors.
 

 In this case, the defense requested that the trial court consider the statutory mitigating factor of whether Davis’s capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired. The defense did not specifically request that the trial court consider its argument that Davis suffered from “impaired capacity” at the time of the crime as nonstatuto-ry mitigation.
 
 [5]
 
 As a result, the trial court was not put on notice that the defense wished it to consider impaired capacity as nonstatutory mitigation in the event that the trial court found the statutory mitigating factor unproven. Accordingly, the trial court did not err in failing to find impaired capacity as a nonstatutory mitigating factor.
 

 Moreover, if the defense had requested that the trial court consider whether Davis’s capacity was impaired as nonstatutory mitigation, the sentencing order demonstrates that the trial court would not have found impaired capacity as an additional nonstatutory mitigating circumstance. After considering the evidence presented at trial, the trial court rejected the substantially impaired capacity statutory mitigating factor, stating:
 

 There is no reasonable evidence that the Defendant’s capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of law was substantially impaired. In fact, the evidence, as outlined above, establishes just the opposite. The evidence, when considered in total, presents a person who knew what he was doing was wrong when he committed these murders and who thought he had taken the necessary precautions to hide his crimes.
 

 Sentencing Order at 50. The trial court found the facts of this case, particularly Davis’s deliberate efforts to hide evidence of his crime and the testimony of the mental health experts who refused to opine that Davis lacked the ability to control his behavior at the time of the murder, to preclude any finding that Davis’s ability to reason and control his behavior was impaired at the time of the crime, not just to negate a finding that his capacity to do so was
 
 substantially
 
 impaired.
 

 C. No Significant History of Prior Criminal Activity
 

 Davis argues that the trial court abused its discretion by allowing the prosecutor to argue that Davis’s behavior in school and jail could reduce the weight accorded to the mitigating factor of no significant history of prior criminal activity. Davis also argues that the trial court abused its discretion by considering post-murder activity and premurder activity for which he was not criminally prosecuted when assigning “little weight” to the mitigating factor.
 

 This issue was preserved for review. The defense conceded that testimony about Davis’s behavior in jail since his arrest and in school was admissible to
 
 *964
 
 rebut evidence offered as nonstatutory mitigation, such as Dr. Krop’s opinion that Davis would function well in prison and lay witness testimony about Davis’s good character. However, the defense made a motion in limine to prevent the State from using evidence about Davis’s behavior in jail and his behavior in school to argue against according weight to the no significant history mitigating factor. After hearing argument from the parties, the trial court ruled that the State could argue that Davis’s conduct in jail and in school diminished the no significant history mitigating factor. Defense counsel twice renewed its objection to this line of argument during the State’s closing statement.
 

 Appellate courts generally apply an abuse-of-discretion standard when considering whether a trial court erred in overruling objections to comments made during closing arguments.
 
 McArthur v. State,
 
 801 So.2d 1037, 1040 (Fla. 5th DCA 2001) (citing
 
 Moore v. State,
 
 701 So.2d 545 (Fla.1997)). Counsel should be permitted wide latitude to advance all legitimate arguments and draw logical inferences from the evidence.
 
 Id.
 
 This Court likewise reviews a trial court’s assignment of weight to proven mitigating factors under an abuse-of-discretion standard. The Court defers to the trial court’s determination “unless no reasonable person would have assigned the weight the trial court did.”
 
 Rodgers v. State,
 
 948 So.2d 655, 669 (Fla.2006).
 

 The State Attorney argued that when considering the mitigating factor of no significant history of prior criminal activity, the jury should factor in Davis’s fights at school, his threatening of a teacher, his fights in jail, and his effort to disable his cell lock. The trial court expressly based its assignment of little weight to this mitigating factor on evidence of Davis’s fights in jail, his destroying of a restraint chair, and his effort to disable his cell lock. Sentencing Order at 37. While the trial court discussed Davis’s misbehavior at home and in school, it did not connect this evidence to its decision to apply little weight to the mitigating factor.
 

 In
 
 Walton v. State,
 
 547 So.2d 622, 625 (Fla.1989), this Court held that the State may rebut the no significant history of prior criminal activity statutory mitigating factor with evidence of “criminal activity,” not solely convictions. Evidence that Davis engaged in physical fights and that he threatened a teacher, assuming the threat rose to the level of an assault, is evidence of criminal activity that could properly be presented to the jury and considered by the trial court. The trial court did not abuse its discretion in allowing the State Attorney to argue this evidence to the jury or in relying on the evidence in its sentencing order.
 
 [6]
 

 Davis argues that the evidence about his conduct in jail should not have been considered in the context of the no significant history mitigating factor because the criminal acts occurred after the
 
 *965
 
 murders. In
 
 Scull v. State,
 
 533 So.2d 1137, 1143 (Fla.1988), this Court expressly receded from its decision in
 
 Ruffin v. State,
 
 397 So.2d 277, 283 (Fla.1981), to the extent that language construing “prior” to mean prior to sentencing would authorize finding a history of prior criminal activity based on contemporaneous crimes. Following
 
 Scull,
 
 this Court held that the mitigating factor of no significant history of prior criminal activity “must be found if a defendant had no significant history of criminal activity prior to the transaction in which the instant murder occurred.”
 
 Santos v. State,
 
 629 So.2d 838, 840 (Fla.1994);
 
 see also Hess v. State,
 
 794 So.2d 1249, 1265 (Fla.2001). We do not agree with the State’s contention that these cases do not preclude consideration of postmurder criminal behavior when assigning weight to the mitigating factor of no significant history. This Court’s decisions from
 
 Scull
 
 to
 
 Hess
 
 consistently direct trial courts to not consider postmurder criminal behavior but instead focus on the defendant’s behavior prior to the murder when deciding whether the defense has proven the mitigating factor of no significant history. Distinguishing between allowing the evidence for purposes of existence of the factor and for purposes of weight of the factor would indirectly allow the admission of evidence that
 
 Scull, Santos,
 
 and
 
 Hess
 
 were intended to exclude. Thus, we now clarify that the State may not present evidence of postmurder behavior or argue from such evidence for the purpose of diminishing the weight of the no significant history of prior criminal activity mitigating factor.
 

 We do agree with the State that in this case any error in the sentencing order was harmless beyond a reasonable doubt.
 
 See Franklin v. State,
 
 965 So.2d 79, 95 (Fla.2007) (applying harmless analysis to erroneously admitted evidence). The trial court assigned great weight to all four aggravating factors in each murder and found that “any of the considered aggravating circumstances found in this case, singularly applied to each victim and standing alone, would be sufficient to outweigh the mitigation in total.” Sentencing Order at 81. Given this finding and the jury’s vote in favor of the death penalty based on proper argument, it does not appear that the assignment of little weight to the no significant history mitigating factor impacted the trial court’s decision to sentence Davis to death.
 

 D. Proportionality
 

 To ensure uniformity of sentencing in death penalty proceedings, this Court considers the totality of the circumstances and compares each case with other capital cases. The Court does not simply compare the number of aggravating and mitigating circumstances.
 
 Taylor v. State,
 
 937 So.2d 590, 601 (Fla.2006). “In performing a proportionality review, a reviewing court must never lose sight of the fact that the death penalty has long been reserved for only the most aggravated and least mitigated of first-degree murders.”
 
 Urbin v. State,
 
 714 So.2d 411, 416 (Fla.1998) (citing
 
 State v. Dixon,
 
 283 So.2d 1, 7 (Fla.1973)). Davis argues that the death penalty is not warranted in this case because he committed the murders during a dissociative episode, he was severely emotionally disturbed and mentally handicapped, and he had no prior history of violence. We disagree. The death sentences imposed in this case are proportionate to death sentences that have been affirmed in other cases.
 

 For example, the murders in this case are factually similar to the murders in
 
 Woodel v. State,
 
 985 So.2d 524 (Fla.2008),
 
 cert. denied,
 
 (2008), — U.S. -, 129 S.Ct. 607, 172 L.Ed.2d 465. In
 
 Woodel,
 
 the defendant killed in their own home two residents of the trailer park where he
 
 *966
 
 lived. Like Davis, Woodel acted out of character and without any apparent motivation. The murders differ in that Woodel did not know his victims and used weapons of opportunity from their trailer rather than arriving at the scene armed. In that case, the trial court found four aggravating factors, three of which were given great weight: prior capital felony (contemporaneous murders); murder in the course of a felony based on burglary; HAC; and particularly vulnerable victim.
 
 Id.
 
 at 532. The
 
 Woodel
 
 trial court did not find CCP, and the crime there was thus arguably less aggravated than the crime in the instant case. In addition, the
 
 Woodel
 
 trial court found more weighty mitigation, including four statutory mitigating factors: no significant history of prior criminal activity; age; substantially impaired capacity; and extreme mental or emotional disturbance. On appeal, this Court affirmed Woodel’s death sentences.
 
 Id.
 
 at 534. In light of this precedent, the death sentences under review here are proportional, despite his lack of prior criminal activity and the inexplicable nature of these murders.
 

 We also find persuasive the State’s argument that the balance of mitigating and aggravating factors here is similar to that present in
 
 Smithers v. State,
 
 826 So.2d 916 (Fla.2002). In
 
 Smithers,
 
 the defendant killed two women and attempted to hide their bodies. The trial court found the HAC, CCP, and previous violent felony (contemporaneous murder) aggravating factors for the first count, and the HAC and previous violent felony (contemporaneous murder) aggravating factors for the second count.
 
 Id.
 
 at 922. The trial court further found and gave moderate weight to both statutory mental health mitigating factors, based on expert testimony about Smithers’ brain damage and chronic mental illness, and found nonstatutory mitigation, including that Smithers suffered abuse as a child.
 
 Id.
 
 While Davis’s case may be slightly more mitigated due to Davis’s young age, the trial court found more aggravation here, specifically that the aggravating factor of murder in the course of a felony applied because Davis forced his way into the victims’ home to commit the murders. Accordingly, the death sentences in
 
 Davis
 
 are proportional with those imposed in
 
 Smithers.
 

 E. Constitutionality of Florida’s Capital Sentencing Procedures
 

 This Court has repeatedly rejected claims based on
 
 Ring v. Arizona,
 
 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), where the prior violent felony aggravating factor is present. For example, in
 
 Frances v. State,
 
 970 So.2d 806, 822 (Fla.2007), this Court found that Frances was not entitled to relief because the trial court found the aggravating circumstances of a prior violent felony conviction, based on contemporaneous convictions for murder and robbery, and because a unanimous jury found him guilty of two counts of premeditated murder and one count of robbery, thereby satisfying the mandates of the United States and Florida Constitutions.
 
 See also Salazar v. State,
 
 991 So.2d 364 (Fla.2008) (rejecting
 
 Ring
 
 argument in light of contemporaneous conviction for attempted murder). In this case, the trial court found the aggravating factor of prior violent felony based on contemporaneous convictions for murder, and the jury unanimously found Davis guilty of first-degree murder under a felony-murder theory, which supports the aggravating factor of murder in the course of a felony. Davis has not offered any argument that distinguishes his case from
 
 Frances.
 
 Accordingly, Davis is not entitled to relief.
 

 F. Sufficiency of Evidence
 

 In appeals where the death penalty has been imposed, this Court indepen
 
 *967
 
 dently reviews the record to confirm that the jury’s verdict is supported by competent, substantial evidence.
 
 See
 
 Fla. R.App. P. 9.142(a)(6). The jury found Davis guilty of first-degree murder of the victims under two theories: felony murder and premeditated murder. The evidence is sufficient under both theories.
 

 The jury heard Davis’s taped confession to law enforcement officers and his. live testimony that he forced his way into the victims’ home and killed them. Davis stated that he paused on the front steps of the victims’ trailer, knocked on the door, asked Wren a few questions when she opened the door, and then stabbed her as he forced his way into the trailer. Davis further stated that when Albin entered the kitchen, he “just went to her next” and obtained a second knife to stab Albin after his knife broke while stabbing Wren. In addition to the confessions, the State presented physical evidence that connected Davis to the murders.
 
 [7]
 

 This evidence supports convictions for felony murder of both victims based on the underlying felony of burglary because the jury reasonably could have inferred that Davis forcibly entered the victims’ home with intent to commit at least an assault and then killed the victims.
 
 See Carter,
 
 980 So.2d at 481 (finding burglary aggravating factor supported in similar factual situation because “Carter either entered Reed’s home uninvited with the intent to commit murder therein, or, notwithstanding an invitation, remained in her home to commit or attempt to commit a forcible felony.”). The evidence supports a conviction for premeditated murder of Wren because the jury reasonably could have inferred that Davis formed a conscious purpose to kill from his bringing a knife to the trailer and his pause to question Wren before stabbing her. The evidence also supports a conviction for premeditated murder of Albin because the jury reasonably could have inferred a conscious purpose to kill Albin from Davis’s apparently deliberate action to cease his attack on Wren to attack Albin.
 
 See Coday v. State,
 
 946 So.2d 988, 996 (Fla.2006) (holding sufficient evidence of premeditation where defendant began attack with hammer and then walked into another room to obtain knife to complete murder);
 
 Sochor v. State,
 
 619 So.2d 285, 288-89 (Fla.1993) (holding sufficient evidence of premeditation where Sochor briefly stopped attack on victim to yell at his brother and then resumed attack).
 

 III. Conclusion
 

 Based on the foregoing, we affirm Davis’s convictions for first-degree murder and his sentences of death.
 

 It is so ordered.
 

 QUINCE, C.J., and WELLS, ANSTEAD, PARIENTE, LEWIS, CANADY, and POLSTON, JJ., concur.
 

 [1]
 

 . The aggravating factors were: (1) Davis was previously convicted of another capital felony, based on the contemporaneous first-degree murders of Wren and Albin (accorded great weight); (2) Davis was engaged in the commission of the crime of burglary, based on Davis forcing his way into the victims’ homes with the intent to commit, at minimum, an assault therein (accorded great weight); (3) the capital felonies were especially heinous, atrocious, or cruel (accorded great weight); and (4) the capital felonies were committed in a cold, calculated, and premeditated manner (accorded great weight).
 

 [2]
 

 . The statutory mitigating factors were: (1) Davis had no significant history of prior criminal activity (accorded little weight); (2) the capital felonies were committed while Davis was under the influence of extreme mental or emotional disturbance (accorded some weight); and (3) Davis was twenty years old at the time of the offenses (accorded some weight).
 

 [3]
 

 . The nonstatutory mitigating factors were: (1) Davis led law enforcement officers to the discovery of the crimes (accorded little weight); (2) Davis was remorseful (accorded slight weight); (3) Davis attended Job Corps (accorded slight weight); (4) Davis was a good, reliable worker (accorded slight weight); (5) Davis could continue to be a productive worker in prison (accorded little weight); (6) Davis was loved by his friends and family (accorded slight weight); (7) people who knew Davis found the crimes to be out of character for him (accorded slight weight); (8) Davis is a loving, valuable member of both sides of his extended family (accorded slight weight); (9) Davis's normal development was impaired by a dysfunctional extended family (accorded some weight); (10) Davis suffered from ADHD or ADD as a child (accorded little weight); (11) Davis suffered from a specific learning disability (accorded little weight); (12) Davis suffered from borderline personality disorder (accorded slight weight); (13) Davis suffered from congenital, organic brain damage in the frontal lobe (accorded some weight); (14) Davis suffered from significant cognitive and memory deficits (accorded little weight); (15) Davis had a low IQ (accorded some weight); (16) Davis could not finish high school or obtain his GED (accorded slight weight); (17) Davis was employed, contributed financially to his household, and acted as a mediator between his roommates (accorded slight weight); (18) Davis conducted himself well in court during trial (accorded slight weight); (19) Davis conducted himself well in court pretrial (accorded slight weight); (20) Davis was learning to devote himself to Christian principles while
 
 *960
 
 incarcerated (accorded slight weight); (21) Davis will function well in prison (accorded slight weight); (22) if not sentenced to death, Davis will spend his life in prison (accorded little weight); (23) society can be protected by life sentences without parole (accorded slight weight); (24) Davis had the support of his family and friends, who continue to love him (accorded slight weight); (25) Davis was troubled by the murders he committed (accorded slight weight); (26) Davis suffered physical and emotional abuse as a child (accorded some weight); and (27) the trial court was provided with a presentence investigation report that contained no new information (accorded slight weight).
 

 [4]
 

 . Davis also argues that the trial court erred in allowing the prosecutor to argue CCP to the jury and in instructing the juiy on CCP. The trial court did not err in allowing the prosecutor to argue that CCP applied because there was evidence from which CCP could be reasonably inferred. Counsel should be permitted wide latitude to advance all legitimate arguments and draw logical inferences from the evidence.
 
 McArthur v. State,
 
 801 So.2d 1037, 1040 (Fla. 5th DCA 2001) (citing
 
 Lukehart v. State,
 
 776 So.2d 906 (Fla.2000)). As for Davis's challenge about instructing the jury on CCP, in
 
 Ford v. State,
 
 802 So.2d 1121, 1133 (Fla.2001), this Court rejected a claim that the jury should not have been instructed on CCP and explained that a "trial court may give a requested juiy instruction on an aggravating circumstance if the evidence adduced at trial is legally sufficient to support a finding of that aggravating circumstance.”
 
 See also Diaz v. State,
 
 860 So.2d 960, 965 n. 6 (Fla.2003);
 
 Conahan v. State,
 
 844 So.2d 629, 638 (Fla.2003). As discussed above, competent, substantial evidence supports the trial court’s finding of CCP. Thus, the trial judge did not err in instructing the juiy on the aggravating factor.
 

 [5]
 

 . The defense requested that the trial court recognize that “Mr. Davis has a combination of significant mental health problems'' as nonstatutory mitigation. While the defense listed numerous mental health problems, trial counsel did not argue that those factors impacted Davis’s “capacity” on the night of the murders, as trial counsel did in the context of the proposed statutory mitigating factors.
 

 [6]
 

 . In its sentencing order, the trial court also discussed Davis's noncriminal juvenile misbehavior when analyzing this mitigating factor. Such evidence is not proper rebuttal pursuant to
 
 Walton.
 
 However, we find that the trial court did not abuse its discretion because the trial court did not rely on this evidence when determining the existence and weight of the mitigating factor. See
 
 Groover v. State,
 
 489 So.2d 15, 17 (Fla.1986) (holding that trial court did not impermissibly rely on noncriminal activity to reject no significant history of prior criminal activity mitigating factor where trial court "simply made a statement concerning the fact that three lives had tragically ended over a fifty dollar drug debt”). In addition, as discussed below, any error would be harmless in light of the trial court's findings on aggravating factors.
 

 [7]
 

 . Law enforcement officers recovered knives and bloody clothing from the locations designated by Davis. A partial knife blade found in Davis’s shorts microscopically matched a partial knife blade found in the victims’ kitchen sink. DNA found on the knife blade found in Davis's shorts matched Wren's DNA. DNA from blood stains found on Davis’s blue jeans matched Albin. Davis’s shoes could not be eliminated as having made impressions found at the crime scene. A knife found on the victims’ kitchen floor had a mixture of DNA on it, to which Davis was the major contributor. And finally, DNA matching Davis was found on a bloody light switch plate in the victims' trailer.