# Supreme Court of Florida

_____

No. SC14-418
_____

**ELIJAH BROOKINS,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

[April 20, 2017]

PER CURIAM.

Elijah Brookins appeals his conviction for first-degree murder and his sentence of death. For the reasons below, we affirm his conviction but vacate his sentence and remand for a new penalty phase.[1]

## BACKGROUND

This case involves a brutal stabbing murder on a Florida Department of Corrections (DOC) transport bus. The two DOC officers responsible for transporting the inmates testified that they did not see or hear anything out of the

_____

1. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const.

ordinary during the drive from Jefferson Correctional Institution to the Northwest Florida Reception Center (NFRC) in Washington County. Both officers testified that the noise on the bus prevented them from hearing the victim, Eric Sexton, scream and beg for their help as the defendant, Elijah Brookins, stabbed the victim to death with a homemade metal shank that Brookins had concealed in the waistband of his pants and snuck onto the bus. Not only did these officers not witness the murder itself, but the officer responsible for security testified that he saw nothing amiss during several security checks he testified that he performed during the more than two-hour drive.

When the bus arrived at NFRC, the DOC officer responsible for processing the inmates testified that the inmates were crowded into the back of the bus and "rushed" her to exit out of the bus's rear door "more quickly than they usually do." She testified that Brookins was the last inmate to get off the bus, was "all bloody" and wearing only a white T-shirt when he should have been wearing the standard blue uniform shirt provided to inmates, and said "the dude went psycho." This officer further testified that there was no blood on any other inmate except Brookins and that when she boarded the bus, its interior was bloody and the floor was littered with debris. She testified that she found the victim, bloody and nonresponsive and "sort of leaning against the seat on the floor half under the seat," near the front of the bus.

The medical examiner testified that the victim had been stabbed 26 times and died as the result of blood loss from his wounds, which included stab wounds to his head, face, neck, arms, hands, back, abdomen, and anus, as well as multiple injuries to his hands that were consistent with defensive wounds. The medical examiner further testified that the victim's wounds were consistent with a homemade metal weapon that law enforcement had recovered from the side of the interstate along the transport route.

The DNA expert testified that both the murder weapon and its elastic holster, which law enforcement also recovered from the side of the interstate, contained blood that matched the victim's. In addition, DNA analysis revealed that Brookins could be included as the minor contributor to DNA recovered from both the elastic holster and murder weapon. DNA from blood recovered from both Brookins' shirt and pants matched the victim, and the victim was included as a possible contributor to DNA recovered from swabs taken from Brookins' hand.

While the officers responsible for the victim's safety during the transport were unable to explain what happened to him, three inmates who were also being transported with the defendant and victim testified to what they saw. Though their accounts differ in some respects, all three men described a horrific attack during which the defendant stabbed the victim repeatedly over the course of 10 to 30

minutes while the victim screamed at the top of his lungs and begged the corrections officers for help.

Specifically, inmate Tyrone Jackson testified that a few minutes after the bus got on I-10, Brookins "ran over and jumped on [the victim]." Jackson testified that he thought the two were fighting at first, but then he saw that Brookins had a knife and the victim was trying to defend himself. Jackson testified that, for approximately 25 to 30 minutes, Brookins stabbed the victim "nonstop" and that he "[j]ust kept going and going and going." Jackson further testified that Brookins was "mumbling" to the victim but that he could not understand what Brookins was saying and that the victim was "screaming to the top of his lungs [and begging the] officers to help." At a point during the attack, while the victim was still alive, Jackson testified to seeing Brookins pause, use his mouth to straighten out the knife that had bent, and then continue to stab the victim.

Inmate Juan Hernandez also testified to a similar surprise attack, specifically that "[i]t wasn't an altercation. It was—it was out of nowhere. . . . It was no discussion, no—no loud talking." Rather, Hernandez said that he heard a noise like a punch, and he turned around and saw Brookins "jump on [the victim] and stab[] him in the face." Hernandez testified that Brookins stabbed the victim multiple times and beat him with the back of the knife for about 10 minutes, and that Brookins told the victim, "You can't get away from me," and called the victim

- 4 -

a "piece of sh*t" who "needed to die." Hernandez also testified that Brookins used both his teeth and the side of the bus to straighten out the knife blade that had bent during the attack so he could continue stabbing the victim, while the victim screamed "Officer, Officer, Officer, help me, officer."

The third inmate, Theodus Hunt, testified that the incident occurred right after the bus merged onto I-10. Hunt testified that he saw Brookins watching Sexton from the time they boarded the bus until the stabbing. However, unlike Jackson and Hernandez, Hunt testified that the incident began when Brookins confronted the victim about selling another inmate a cigarette in exchange for food. Hunt testified that Brookins pushed the victim, the victim pushed him back, and then Brookins "reached on the side of his pants and ripped his pants open and pulled a knife out of the side part of his pants." Hunt identified the elastic waistband that had been recovered by law enforcement as the waistband from which Brookins pulled the knife and testified that the victim "was screaming to the top of his voice" during the stabbing.

Testimony from these inmates also established that, following the murder, Brookins put on gloves and stuck his hand and the knife up the victim's anus and said, "Where is it at, boy? Where it at? Where the package?" Brookins also removed some of the victim's clothes, thoroughly searched the victim's property, took some of the victim's property and put it with his own, ripped up the victim's

- 5 -

pictures, sat down and propped his feet up on the victim's body, ate the bagged lunch that had been provided to the victim, and urinated on the victim's body. In addition, Brookins cleaned up and washed his hands with the inmates' drinking water and threw several items, including the gloves, elastic holster, bloody clothing, and murder weapon out the bus window.

Brookins testified in his defense. He denied killing the victim and testified that the victim's blood was on his clothing because the victim fell on him during the attack, at which point he helped the victim into a seat. Brookins further testified that he pulled the shank out of the victim because the victim asked for his help. On cross-examination, Brookins testified that fellow inmate, Theodus Hunt, killed the victim.

The jury found Brookins guilty of first-degree premeditated and felony murder.

During the penalty phase, the State introduced, pursuant to a stipulation with the defense, a certified copy of Brookins' prior conviction for the first-degree murder he committed when he was a juvenile and for which he was serving a life sentence at the time of Sexton's murder. In addition, the State called Sexton's sister, who read her victim impact statement to the court.

The defense, during the penalty phase, conceded that the State had proven the statutory aggravating circumstances of HAC, prior violent felony, and

committed by a person previously convicted of a felony and under sentence of imprisonment, and further conceded that there were no statutory mitigating circumstances. The defense presented the testimony of Brookins' older sister, younger sister, and aunt. These witnesses testified about Brookins' poverty-stricken childhood in a crime-ridden public housing project, his abandonment by his father, learning problems Brookins had that caused him to drop out of school, his imprisonment as a juvenile, and their difficulty visiting him because of finances but their desire for him to be a part of their lives. The defense did not present testimony from a mental health expert, and Brookins did not testify during the penalty phase.

The jury recommended the death penalty by a vote of ten to two. At the subsequent Spencer[2] hearing, the State presented written statements from two of the victim's family members, and two members of Brookins' family requested mercy.

_____

2. Spencer v. State, 615 So. 2d 688 (Fla. 1993).

Thereafter, the trial court followed the jury's recommendation and sentenced Brookins to death, concluding that the aggravating circumstances[3] outweighed the mitigating circumstances.[4]

## ISSUES ON APPEAL

Brookins raises the following guilt phase[5] issues on appeal: (1) whether the trial court erred in admitting collateral crime evidence for purposes of

---

3. The trial court found the following aggravating circumstances: (1) committed by a person previously convicted of a felony and under sentence of imprisonment (great weight); (2) prior violent felony (great weight); (3) in the course of a robbery (substantial weight); (4) especially heinous, atrocious, or cruel (very great weight); and (5) cold, calculated, and premeditated (substantial weight). The trial court further found that, even standing alone, the prior violent felony and HAC aggravators would outweigh the mitigation presented.

4. The trial court found no statutory mitigating circumstances and the following eight nonstatutory mitigating circumstances: (1) Brookins' prior criminal history consisted of a single offense committed when he was 15 years old (moderate weight as against the prior violent felony aggravating circumstance; not mitigating as to other aggravators); (2) Brookins was imprisoned for his entire adult life and most of his adolescence (very little weight); (3) Brookins was abandoned by his father and raised by his mentally disabled mother (little weight); (4) Brookins' family was impoverished (little weight); (5) Brookins' childhood was spent in a crime-ridden public housing project (little weight); (6) Brookins is loved by his family (very little weight); (7) Brookins was a loving, supportive son and brother (very little weight); and (8) Brookins was a slow learner and dropped out of school very young (little weight).

5. Because we are remanding for a new penalty phase, we do not address the penalty phase issues that Brookins raised on appeal. Brookins also argues that the cumulative effect of the guilt phase errors entitles him to a new guilt phase. However, because there are no guilt phase errors to cumulate, Brookins is not entitled to relief. See Dufour v. State, 905 So. 2d 42, 65 (Fla. 2005).

- 8 -

impeachment; and (2) whether the State improperly commented on his right to silence. We also review whether the evidence is sufficient to support Brookins' conviction and whether Brookins is entitled to relief pursuant to Hurst v. State, 202 So. 3d 40 (Fla. 2016), petition for cert. filed, No. 16-998 (U.S. Feb. 13, 2017).

## 1. Collateral Crime Evidence

Brookins first argues that the trial court erred by admitting, for purposes of impeachment, collateral crime evidence that he signed a sworn statement in which he admitted to concealing a metal shank inside his pants while in jail awaiting trial for the victim's murder.[6] Before trial, the State filed a notice of intent to introduce this collateral crime evidence under section 90.404(2), Florida Statutes. Brookins filed a motion in limine seeking to exclude it. At the hearing on the motion, the State represented that it did not intend to introduce the evidence during its case-in-chief but that it might be used to impeach Brookins if he testified at trial.

At trial, Brookins testified in his defense, and during his direct examination, he testified about the extensive strip and property searches that corrections officers performed on the day of Sexton's murder before he and the other inmates boarded

_____

6. "A trial court's decision regarding the admission of collateral crime evidence is subject to an abuse-of-discretion review." Hodges v. State, 55 So. 3d 515, 538 (Fla. 2010).

the transport bus. Brookins further testified that, after these searches occurred, officers kept the inmates within view until the bus arrived.

On cross-examination, the State inquired about the strip search:

Q    So, I want to go back to the strip search a little bit. You said that it was very thorough?
A    Yes, sir.
Q    They went through every square inch of your clothing?
A    Yes, sir.
Q    No possible way that you could have secreted a shank, such as the one we have here, Exhibit Number 5, in your clothing?
A    Yes, sir.
Q    Isn't it true that you do know how to secret[] a shank in your clothing?
A    No, sir.
Q    Isn't it true that you've had a shank in your clothing before?
A    No, sir.

Defense counsel did not object to any of the State's questions. Based on Brookins' answers, the State requested a bench conference and informed the trial court that it intended to impeach Brookins with his sworn statement pertaining to the shank. Defense counsel objected at that point, arguing that Brookins' testimony on direct did not provide a factual basis for admitting the collateral crime evidence and that the State had created the problem on cross-examination. The trial court overruled the objection, finding Brookins opened the door to questions regarding his knowledge and ability to conceal items from corrections officers by volunteering the strip search on direct examination to support the inference that it would have been impossible for him to get the shank on the bus.

- 10 -

The State then questioned Brookins regarding his sworn statement. Brookins acknowledged that he signed the statement, in which he admitted to having a shank while in jail. However, Brookins testified that he does not know about shanks and that he was lying about the shank being his when he signed the statement.

As this Court has explained, a testifying defendant may open the door to impeachment with otherwise inadmissible collateral crime evidence by "inaccurately testifying to material facts." See, e.g., Robertson v. State, 829 So. 2d 901, 911 (Fla. 2002) (citing § 90.404(1)(c), Fla. Stat.). To do so, "the defense must first offer misleading testimony or make a specific factual assertion which the state has the right to correct so that the jury will not be misled." Id. at 913 (quoting Bozeman v. State, 698 So. 2d 629, 630 (Fla. 4th DCA 1997)).

In this case, the knowledge and ability to hide a shank was material since the victim was killed by a shank brought onto the transport bus. As the trial court correctly ruled, Brookins' direct testimony about the strip search supported the inference that he could not have gotten the shank onto the bus and, therefore, opened the door to cross-examination on that subject and impeachment with the sworn statement that contradicted his testimony. See Geralds v. State, 674 So. 2d 96, 99 (Fla. 1996) ("[C]ross-examination is not confined to the identical details testified to in chief, but extends to its entire subject matter, and to all matters that

may modify, supplement, contradict, rebut, or make clearer the facts testified to in chief[.]") (quoting Coco v. State, 62 So. 2d 892, 895 (Fla. 1953)).

However, even if the trial court had erred in permitting the State to impeach Brookins with his sworn statement, any error would be harmless beyond a reasonable doubt. See State v. DiGuilio, 491 So. 2d 1129, 1135 (Fla. 1986).

## 2. Right to Silence

Brookins next argues that the State improperly commented on his right to silence.[7] As explained above, Brookins testified at trial. On direct examination, his counsel asked him what happened when the transport bus arrived at NFRC. Brookins replied:

> Everybody got off the bus. When I got off the bus, the lady was like, what happened to you? I said, dude went crazy in there. She say, who? I said, a dude in there[.]

Defense counsel also asked Brookins, "Is there a reason why you didn't say who specifically did it?" Brookins answered, "I didn't want to be labeled as the police." Counsel then asked, "That's not a good thing in prison, right?" to which Brookins responded, "Right." Defense counsel did not ask Brookins to name, and Brookins did not name, the alleged killer on direct examination.

---

7. This Court reviews de novo a claim that the prosecutor's comment violated the defendant's right to silence. See State v. Smith, 573 So. 2d 306, 317-18 (Fla. 1990).

On cross-examination, the State asked Brookins if he saw who had the knife, and Brookins identified fellow inmate, Theodus Hunt, as the killer. The State then asked Brookins if he told the officers at the correctional facility that Hunt committed the murder, who he had told that to, and whether he had told anyone that Hunt murdered the victim "until today." Brookins' counsel objected on the ground that the State improperly commented on Brookins' right to silence. The prosecutor countered, "[I]t's a fair comment on his testimony. He's up here telling us a story. I didn't mention anything about custodial interrogation, any reading of his rights, or anything like that. I think I'm entitled to challenge him on this testimony." The trial court overruled Brookins' objection. The State again elicited an admission from Brookins that he had never told anyone his version of events prior to testifying at trial and reiterated Brookins' admission during its closing argument, stating:

> The first time he ever told anybody this story about Theodus Hunt chasing Eric Sexton down the aisle of that bus is here in this courtroom, and he admitted that.

This Court has explained that "courts must prohibit all evidence or argument that is fairly susceptible of being interpreted by the jury as a comment on the right of silence." Smith, 573 So. 2d at 317. Accordingly, "[t]he prosecution is not permitted to comment upon a defendant's failure to offer an exculpatory statement prior to trial, since this would amount to a comment upon the defendant's right to

remain silent." Id. (quoting Hosper v. State, 513 So. 2d 234, 235 (Fla. 3d DCA 1987)). However, it is not impermissible for the State to impeach the defendant with his voluntary prearrest statements. See, e.g., White v. State, 757 So. 2d 542, 547 (Fla. 4th DCA 2000) ("The prosecutor's remarks were not directed to [the defendant's] silence either during or after his arrest, but were used to impeach [the defendant's] trial testimony concerning his voluntary prearrest statements, which denied ownership [of cocaine] but omitted material, significant facts [(the owner's identity)] that would naturally have been asserted.") (citing State v. Hoggins, 718 So. 2d 761, 770 (Fla. 1998), for the proposition that prearrest silence can be used to impeach a defendant, as long as silence was inconsistent with defendant's testimony at trial)).

In this case, it was not impermissible for the State to suggest that Brookins naturally would have disclosed Hunt's identity as the alleged killer in his voluntary prearrest statement that a "dude went crazy in there." However, defense counsel opened the door even further by having Brookins testify to his motive for not identifying the alleged killer, namely that he did not want to be "labeled as police." While Brookins suggests that the State's inquiry should have been limited to the timing of Brookins' statement, namely when Brookins got off the bus, defense counsel did not limit his questioning to this time period. Rather, defense counsel elicited more general testimony from Brookins that it is "not a good thing in

- 14 -

prison" to be "labeled as police," leaving the jury with the impression that Brookins' fear of being classified as a snitch prevented him from identifying the alleged killer prior to trial. Moreover, by not asking Brookins to identify the alleged killer on direct, defense counsel further impressed upon the jury that being "labeled as the police" is such a bad thing in prison that Brookins would not voluntarily disclose the actual killer's identity even when testifying in his own defense.

A defendant cannot testify to a motive for keeping the alleged actual killer's identity a secret and then use his right to silence to shield that motive from attack on cross-examination. See Hudson v. State, 992 So. 2d 96, 110 (Fla. 2008) ("[T]he concept of 'opening the door' allows the admission of otherwise inadmissible testimony to 'qualify, explain, or limit' testimony or evidence previously admitted." (quoting Lawrence v. State, 846 So. 2d 440, 452 (Fla. 2003))); Chandler v. State, 702 So. 2d 186, 195-96 (Fla. 1997) ("The credibility of a criminal defendant who takes the stand and testifies may be attacked in the same manner as any other witness.") (quoting Charles W. Ehrhardt, Florida Evidence, § 608.1 at 385 (1997 ed.)); see also United States v. Gant, 17 F.3d 935, 941 (7th Cir. 1994) (recognizing that, while "the reason for an arrestee's post-Miranda silence is [usually] insolubly ambiguous," a defendant may open the door to impeachment with silence "by his own remarks about his post-arrest behavior or by defense

counsel's questioning") (quotation omitted); cf. Waid v. State, 58 So. 2d 146, 146 (Fla. 1952) ("When [a defendant] brings to the attention of the jury the want of testimony by him and the reason for the course he chose, he invites a rebuttal from his adversary, and of that he cannot complain."). Accordingly, because Brookins opened the door by providing a motive for not identifying the alleged actual killer, the State did not improperly comment on his right to silence by attacking that motive.[8]

However, even if the State had moved beyond the opening defense counsel created on direct, any error would be harmless beyond a reasonable doubt. See DiGuilio, 491 So. 2d at 1135.

### 3. Sufficiency

"[T]his Court has a mandatory obligation to independently review the sufficiency of the evidence in every case in which a sentence of death has been imposed." Miller v. State, 42 So. 3d 204, 227 (Fla. 2010). To conduct this review, this Court "view[s] the evidence in the light most favorable to the State to

---

8. Brookins also argues that the prosecutor's statement during closing argument that a defendant's "words do not become the truth just because he has the right to remain silent and decides to talk" was an improper comment on Brookins' right not to testify. However, it is clear from the record that the prosecutor was discussing the jury instruction regarding the defendant testifying rather than improperly commenting on the defendant's right not to testify, as the prosecutor went on to say that a defendant who testifies "becomes like every other witness in the case, and the judge has already told you that."

determine whether a rational trier of fact could have found the existence of the elements of the crime beyond a reasonable doubt." Rodgers v. State, 948 So. 2d 655, 674 (Fla. 2006); see also Davis v. State, 2 So. 3d 952, 966-67 (Fla. 2008) ("In appeals where the death penalty has been imposed, this Court independently reviews the record to confirm that the jury's verdict is supported by competent, substantial evidence.").

As explained above, three eyewitnesses identified Brookins as the killer and further testified that Brookins took some of the victim's property following the murder. Moreover, other evidence, including DNA evidence, also implicated Brookins in the crime. This evidence is sufficient to support Brookins' conviction.

### 4. **Hurst**

After the United States Supreme Court issued its decision in Hurst v. Florida, 136 S. Ct. 616 (2016), Brookins filed an amended brief in this Court. And because the jury recommended the death penalty by a vote of ten to two, we conclude that Brookins' death sentence violates Hurst. See Kopsho v. State, 209 So. 3d 568, 570 (Fla. 2017).

We must then consider whether the Hurst error was harmless beyond a reasonable doubt:

> The harmless error test, as set forth in Chapman[v. California, 386 U.S. 18 (1967),] and progeny, places the burden on the state, as the beneficiary of the error, to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict or, alternatively

stated, that there is no reasonable possibility that the error contributed to the conviction.

Hurst, 202 So. 3d at 68 (quoting DiGuilio, 491 So. 2d at 1138).

Because the jury in this case recommended death by a vote of ten to two, "we cannot determine that the jury unanimously found that the aggravators outweighed the mitigation." Kopsho, 209 So. 3d at 570. "We can only determine that the jury did not unanimously recommend a sentence of death." Id. Therefore, because we cannot say that there is no possibility that the error did not contribute to the sentence, the error in Brookins' sentencing was not harmless beyond a reasonable doubt.

Accordingly, we vacate the death sentence and remand for a new penalty phase. See Hurst, 202 So. 3d at 69.

## CONCLUSION

For the foregoing reasons, we affirm Brookins' conviction for first-degree murder but remand for a new penalty phase.

LABARGA, C.J., and PARIENTE, LEWIS, and QUINCE, JJ., concur.
LAWSON, J., concurs as to the conviction but dissents as to the sentence with an opinion, in which CANADY and POLSTON, JJ., concur.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

LAWSON, J., concurring in part and dissenting in part.

I concur with the majority's decision except its vacating of the death sentence pursuant to <u>Hurst</u>. In light of the defendant's prior violent felony conviction, there is no <u>Hurst v. Florida</u> error. <u>See</u> <u>Hurst v. State</u>, 202 So. 3d 40, 81-82 (Fla. 2016) (Canady, J., dissenting), <u>petition for cert. filed</u>, No. 16-998 (U.S. Feb. 13, 2017).

CANADY and POLSTON, JJ., concur.

An Appeal from the Circuit Court in and for Gadsden County,
     Jonathan Eric Sjostrom, Judge - Case No. 202012CF000478XXAXMX

Baya Harrison, III, Monticello, Florida,

     for Appellant

Pamela Jo Bondi, Attorney General, and Jennifer L. Keegan, Assistant Attorney General, Tallahassee, Florida,

     for Appellee